[No. H006752. Sixth Dist. Nov. 22, 1991.]

SHAPELL INDUSTRIES, INC., Plaintiff and Respondent, v.
GOVERNING BOARD OF THE MILPITAS UNIFIED SCHOOL
DISTRICT, Defendant and Appellant.

**COUNSEL**

Hallgrimson, McNichols, McCann & Inderbitzen, Harvey Levine and John T. Schreiber for Defendant and Appellant.

Karen M. Steentofte as Amicus Curiae on behalf of Defendant and Appellant.

Bernard & Wood, Steven M. Bernard and Elise M. Balgley for Plaintiff and Respondent.

## OPINION

BAMATTRE-MANOUKIAN, J.—In 1987, the governing board of the Milpitas Unified School District (District) passed two resolutions which authorized the levy of a "school facilities fee" of $1.50 per square foot on new residential development and $0.25 per square foot on new commercial and industrial development throughout the District. Developers were required to pay fees in those amounts to the District as a condition of obtaining a building permit. Shapell Industries, Inc., a developer, tendered payment under protest and brought suit against the District seeking invalidation of both resolutions and a refund of its money. The trial court issued a writ of mandate granting the requested relief and the District appeals from the judgment.

We will affirm in part and reverse in part. We affirm that portion of the judgment ordering a refund of all commercial and industrial fees collected pursuant to Resolution No. 87.12, finding that the District acted without any reasonable basis for imposing those fees. We reverse the judgment, however, insofar as it ordered a refund of all residential fees collected pursuant to Resolution No. 87.12. As to those fees we direct that the court instead order a partial refund to Shapell Industries, Inc., in compliance with Government Code section 66020, subdivision (e) (hereafter section 66020(e)), and in accordance with the views we express herein. Finally, we reverse the trial court's judgment invalidating Resolution No. 88.7, which imposed fees on commercial and industrial property only. We find that resolution to be valid and we therefore direct that the trial court enter judgment in favor of the District as to Resolution No. 88.7.

### BACKGROUND

In the early 1970's, in the wake of increased resistance throughout California to rising property taxes, local governments found themselves faced with the task of devising new methods to finance construction of school facilities. A wave of residential development, causing serious overcrowding in local schools, contributed to the problem. (See, generally, *Builders Assn. of Santa Clara-Santa Cruz Counties v. Superior Court* (1974) 13 Cal.3d 225, 227-230 [118 Cal.Rptr. 158, 529 P.2d 582] (*Builders Assn.*); *Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 881-885 [218 Cal.Rptr. 303, 705 P.2d 876] (*Candid Enterprises*).)

In an effort to keep pace with the continuing influx of new students, local governments began the practice of imposing fees on developers to cover the costs of new school facilities made necessary by the new housing. Such "school-impact fees" were generally considered to be a valid exercise of the police power under the California Constitution (Cal. Const. art. XI, § 7), so long as the local entity could demonstrate a reasonable relationship between the fee imposed and the need for increased facilities created by the development. (*Builders Assn., supra,* 13 Cal.3d at p. 232, fn. 6; *Candid Enterprises, supra,* 39 Cal.3d at p. 885.)

In 1977, with the passage of Senate Bill No. 201 (The School Facilities Act, effective Jan. 1, 1978), the Legislature specifically authorized cities and counties to enact ordinances requiring residential developers to pay fees to finance temporary school facilities necessitated by new development. In the preamble to the act, the Legislature set forth its findings that "residential developments may require the expansion of existing public schools or the construction of new school facilities" and that "funds for the construction of new classroom facilities are not available when new development occurs, resulting in the overcrowding of existing schools." Therefore, "new and improved methods of financing for interim school facilities necessitated by new development are needed in California." (Gov. Code, § 65970.)

The School Facilities Act, as originally enacted, proved to be a stopgap measure. (*Candid Enterprises, supra,* 39 Cal.3d at p. 882.) In 1986 it was substantially revised and expanded with the passage of a comprehensive multibill package, addressing an identified $3.8 billion need for new permanent school facilities to meet the demands of an expanding population. The heart of this legislation, Assembly Bill No. 2926, consolidated the legal authority for assessment of developer fees for school facilities into a single body of law. It authorized the governing boards of the school districts themselves, rather than city councils or county boards of supervisors, to impose school-impact fees districtwide, subject to certain monetary limitations. (Gov. Code, § 53080, subd. (a), added by Stats. 1986, ch. 887, § 8, p. 3080 amended by Stats. 1986, ch. 888, § 6, pp. 3090-3091.)[1] No building permit would be issued for any development project within the District until the fees had been paid. (Gov. Code, § 53080, subd. (b).)

The limitations are set forth in Government Code section 65995, which specifies a maximum fee assessment level of $1.50 per square foot for

---

[1]Government Code section 53080, subdivision (a): "The governing board of any school district is authorized to levy a fee, charge, dedication, or other form of requirement against any development project . . . within the boundaries of the district, for the purpose of funding the construction or reconstruction of school facilities, subject to any limitations set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7."

residential construction and $0.25 per square foot for commercial or industrial construction, and provides for annual adjustments for inflation. (Gov. Code, § 65995, subds. (a) and (b)(3).)

Assembly Bill No. 2926 was intended to provide the exclusive method of raising local financing for permanent school facilities.[2] Funds raised pursuant to sections 53080 and 65995 would provide a "local match" for state funding from various sources. (Ed. Code, § 17705.5, added by Stats. 1986, ch. 887, § 2, p. 3076.)

The concerns expressed by the Legislature in 1977 were reiterated in its published findings in 1986. It found that "substantial development" in many areas of the state had resulted in "serious overcrowding in school facilities," that "the lack of availability of the public revenues needed to construct school facilities is a serious problem, undermining both the education of the state's children and the continued economic prosperity of California," and that a "school facilities finance program" was necessary "to ensure the availability of school facilities to serve the population growth generated by new development." Finally, the Legislature found that "the levying of appropriate fees by school district governing boards at the rates authorized by this act is a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district." (Stats. 1986, ch. 887, § 7, subd. (e), p. 3080.)

In anticipation of the passage of Assembly Bill No. 2926, which was to become effective January 1, 1987, school districts statewide, including the District began accumulating data to evaluate local needs. On January 13, 1987, the governing board of the District (the Board) adopted Resolution No. 87.12. The resolution provided that no building permit could be issued within the District unless the builder first obtained a certificate of compliance from the District, evidencing payment of development fees in the amount of $1.50 per square foot in the case of residential development and $0.25 per square foot in the case of commercial or industrial development.[3]

Resolution No. 87.12 contained certain findings which the Board stated were based upon evidence and testimony presented at a public hearing. It

[2]Government Code section 65995, subdivision (d) as originally enacted states that "the Legislature hereby occupies the subject matter of mandatory development fees and other development requirements for school facilities finance to the exclusion of all local measures on the subject." (Now subd. (e).)

[3]Resolution No. 87.12 was shortly followed by Resolution Nos. 87.13 and 87.14 which provided that Resolution No. 87.12 was an urgency measure, effective immediately upon its enactment.

found that conditions of overcrowding existed in district schools due to new development, and that proposed development was anticipated to increase enrollment beyond the capacity of the District's facilities. And it found that fees in the maximum amounts allowable by state law were "reasonably related to the need for schools caused by the development."

At the time of this enactment, the Board had before it a staff report prepared by Robert Nicolai, its director of business and administrative services, entitled "Supporting Rationale for Developer Fee Implementation." That report in turn relied upon data obtained from three identified sources: 1) enrollment projection figures compiled by a consultant hired by the District, Morgan Woollett and Associates, 2) a report from the Milpitas City Planning Department regarding housing increases and general plan amendments, and 3) information from individual developers relating to their housing development schedules.

Nicolai's "Supporting Rationale" projected that by the year 2000, enrollment in the District would reach a total of 12,211 students, an increase of 4,410 students from the 1986 total of 7,801. He estimated total costs to accommodate the increased enrollment at $17,482,200. Based on the number of housing units expected to be built within the District to reach a building saturation point, Nicolai figured that approximately 7,135,500 square feet of new housing would be available to be assessed. That amount of square footage would have to be assessed $2.45 per square foot in order to finance the needed facilities. Since that exceeded the statutory maximum of $1.50 per square foot, Nicolai concluded that the maximum amount could be imposed. Furthermore, since there would be a substantial shortfall between the amount which could be collected on residential property and the total amount needed, he concluded the District was also justified in imposing the maximum $0.25 per square foot fee on commercial and industrial development. No separate study was available at the time regarding the relationship between commercial and industrial development and increased enrollment.

At the time the Board passed Resolution No. 87.12, Shapell Industries, Inc. (Shapell) was engaged in developing residential and commercial property within the District's jurisdiction. On July 7, 1987, Shapell filed its complaint for declaratory relief and petition for a writ of mandate in Santa Clara County Superior Court, seeking invalidation of Resolution No. 87.12 on grounds that the Board's action was arbitrary and capricious and without evidentiary support. In general Shapell alleged that the supporting study failed to examine the impact of future development on student enrollment and that the fees assessed exceeded the costs of the facilities for which they were imposed.

Subsequent to the filing of Shapell's complaint, the District commissioned two further studies, which were submitted to the Board in September of 1987. The first of these, a report by Earth Metrics Incorporated, reviewed the earlier "Supporting Rationale for Developer Fee Implementation" and found it to be adequate. The second, prepared by school planning services, specifically addressed the fee imposed on commercial and industrial development and found it to be reasonably related to the need for schools caused by that type of development. On October 27, 1987, the Board passed Resolution No. 88.7, in which it reimposed the $0.25 per square foot development fee on commercial and industrial development within the District. Thereafter, on December 23, 1987, Shapell filed a first amended complaint, adding allegations challenging Resolution No. 88.7.

A trial was held May 31, 1989, following extensive written briefing by both parties. By that time Shapell had paid the District, under protest, $597,676.50 for residential development fees pursuant to Resolution No. 87.12 and an unspecified sum in fees for commercial and industrial development pursuant to Resolution Nos. 87.12 and 88.7. After trial, further written argument followed and in due course the court issued a statement of decision.

In its statement of decision the court found that both Resolution Nos. 87.12 and 88.7 violated the due process and equal protection clauses of the United States and California Constitutions, because of "the lack of a demonstrated nexus between new residential development and increased enrollment in the District" and a similar lack of any "connection between new commercial/industrial development and increased enrollment." The court also found that the development fees constituted a "special tax" under Government Code section 50076, since they exceeded the reasonable cost of the facilities for which they were imposed; the fees would therefore be invalid without a two-thirds vote of the voters of the District. (Cal. Const. art. XIII A, § 4; Gov. Code, § 50076.) The court concluded that the District had acted in an arbitrary and capricious manner in enacting the resolutions and that the enactments were not supported by substantial evidence in the record. The court issued its judgment and peremptory writ of mandate on November 13, 1989, ordering the District to revoke its resolutions and to refund to Shapell all fees previously paid pursuant to said resolutions, plus interest.

The District moved to vacate the judgment arguing, inter alia, that the court had erred in ordering a refund of all of the fees paid by Shapell, since imposition of a school facilities fee in some amount was expressly authorized by Government Code sections 53080 and 65995. The District asked that

the court hold further proceedings to determine what portion of the fees charged exceeded a reasonable amount and order a refund of that portion only. The court heard the motion but did not rule upon it and, pursuant to Code of Civil Procedure section 660, the motion is deemed to be have been denied.

The District appeals from the judgment ordering that both resolutions be revoked and all fees refunded to Shapell.

## I.

### STANDARD OF REVIEW

At the outset we encounter the problem of determining and applying the appropriate standard of review. Different tests have developed depending upon the nature and effect of the local agency's action.

In general if an agency acts pursuant to legislative authority, review of the action is by ordinary mandamus. (Code Civ. Proc., § 1085.) In ordinary mandamus proceedings courts exercise very limited review "out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31], fn. omitted.) The court may not weigh the evidence adduced before the administrative agency or substitute its judgment for that of the agency, for to do so would frustrate legislative mandate. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833-835 [27 Cal.Rptr. 19, 377 P.2d 83].) An agency acting in a quasi-legislative capacity is not required by law to make findings indicating the reasons for its action (*City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 389, 390-391 [142 Cal.Rptr. 873]), and the court does not concern itself with the wisdom underlying the agency's action any more than it would were the challenge to a state or federal legislative enactment. (*Stauffer Chemical Co.* v. *Air Resources Board* (1982) 128 Cal.App.3d 789, 794-796 [180 Cal.Rptr. 550]; *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659]; *City of Santa Cruz* v. *Local Agency Formation Com., supra,* at p. 389.) In sum, the court confines itself to a determination whether the agency's action has been " ' "arbitrary, capricious, or entirely lacking in evidentiary support . . . ." ' " (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29] (*Strumsky*), quoting *Pitts* v. *Perluss, supra,* at p. 833 and *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 605 [241 P.2d 283].)

█ If the administrative proceedings are quasi-judicial in character, judicial review will be stricter. Whereas quasi-legislative acts involve the formulation of rules of wide application, quasi-judicial action involves "the actual application of such a rule to a specific set of existing facts." (*Strumsky, supra,* 11 Cal.3d at pp. 34-35, fn 2.) Since such a proceeding adjudicates individual rights and interests, findings are required and the reviewing court looks to see whether the findings are supported by the evidence. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12]; *Stauffer Chemical Co.* v. *Air Resources Board, supra,* 128 Cal.App.3d at p. 794.) If fundamental rights are implicated the court may be authorized to exercise its independent judgment to determine whether the findings are supported by the weight of the evidence. In all other cases the court examines the record for substantial evidence in support of the findings. (Code Civ. Proc., § 1094.5, subds. (b) and (c).)

█ In the case before us, the Board enacted the subject resolutions under the legislative authority granted it by Government Code sections 53080 and 65995. The fact that the proceedings bore some indicia of quasi-judicial action, in that public hearings were held and findings made, does not change their basic legislative character. (*City of Santa Cruz* v. *Local Agency Formation Com., supra,* 76 Cal.App.3d at p. 388.) Thus it appears the parties are correct in concluding that review in this case is by ordinary mandamus. (See, e.g., *Balch Enterprises, Inc.* v. *New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783, 791 [268 Cal.Rptr. 54] (*Balch Enterprises*).)

Having agreed, however, that judicial review is limited to a determination whether the Board's action was "arbitrary, capricious, or entirely lacking in evidentiary support," Shapell takes the position that the inquiry with regard to the evidence is nonetheless a substantial evidence review. In other words, Shapell claims that as a matter of practical application "evidentiary support" and "substantial evidence" are synonymous terms.

Shapell relies chiefly upon *City of Santa Cruz* v. *Local Agency Formation Com., supra,* 76 Cal.App.3d 381 in support of its position. In that case the Court of Appeal stated the usual standard of review for ordinary mandamus and then applied the substantial evidence test to determine whether the agency's decision was entirely lacking in evidentiary support. More recently, another court observed that in reviewing imposition of a school-impact fee under Government Code section 65995, the traditional standard of review is virtually indistinguishable from the substantial evidence test as applied in administrative mandamus actions. The court cautioned, however, that "[p]rocedural or evidentiary requirements drawn from analogy to judicial proceedings would appear peculiarly inappropriate here." (*Balch Enterprises, supra,* 219 Cal.App.3d at p. 792.)

The District takes that cautionary language to heart. It argues that it is not only possible to distinguish between the two standards, but it is essential: judicial review of legislative acts by means of the substantial evidence test violates the constitutional principle of separation of powers and ignores established precedent. The District maintains that courts must defer to legislative actions by local agencies unless the agency's decision is entirely lacking in *any* evidentiary support.

We cannot agree that local legislation, particularly that which results in the imposition of substantial fees on property owners as a condition of improving their property, should be virtually immune from effective judicial review. If courts shun evidentiary review as beyond their province, the reasonableness of the agency's action is relegated to the agencies themselves, whose primary interest is in financing their own projects. On the other hand, we do not advocate an approach which renders the two standards interchangeable, since there are sound policy reasons for the courts to exercise considerable deference to agencies acting under legislative mandate.

The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other. (See, generally, *California Hotel & Motel Assn.* v. *Industrial Welfare Com.*, *supra*, 25 Cal.3d 200, 212-213, fn. 30.) Since the ultimate question is whether the agency has abused its discretion, the answer is one of degree. In each case the court must satisfy itself that the order was supported by the evidence, although what constitutes reasonable evidentiary support may vary depending upon the nature of the action. (*Ibid.*; *Balch Enterprises*, *supra*, 219 Cal.App.3d at p. 792.) A proceeding which has determined individual rights in a factual context will warrant more exacting judicial review of the evidence. Otherwise courts will tend to defer to the presumed expertise of the agency acting within its scope of authority. Our case lies towards that end of the continuum, where the focus is on the reasonableness of the agency's action as a whole.

For our purposes we find useful the test articulated by our Supreme Court in *California Hotel & Motel Assn.* v. *Industrial Welfare Com.*, *supra*, 25 Cal.3d 200: "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*Id.* at p. 212, fn. omitted.)

The trial court's statement of decision reveals that the court struggled, as we have, with the application of the appropriate standard of review.

It resolved the problem by making identical findings under each of the two generally accepted standards. Whether the trial court applied the correct test or not, however, does not determine the outcome here. In a mandamus proceeding, the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law. (*City of South Gate* v. *Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1422 [229 Cal.Rptr. 568]; *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].) Trial and appellate courts therefore perform the same function and the trial court's statement of decision has no conclusive effect upon us. (*Ibid.*; *Manjares* v. *Newton* (1966) 64 Cal.2d 365, 370-371 [49 Cal.Rptr. 805, 411 P.2d 901].) "[R]eview by this court will preclude any possibility of prejudice from any mistake by the trial court as to the proper scope of review." (*Lewin* v. *St. Joseph Hospital of Orange, supra,* at p. 386.)

█ Finally, there is the question whether the court properly considered evidence in the form of a 23-page report prepared by Dr. Shelley Lapkoff, which was submitted to the trial court but was not before the Board at the time the resolutions were passed. In essence Lapkoff's report refuted the other studies upon which the Board had based its decision. Shapell cites authority for the proposition that evidence outside the administrative record is admissible in traditional mandamus proceedings. (*Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104, 1112 [232 Cal.Rptr. 359]; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66]; *Sierra Club* v. *Gilroy City Council* (1990) 222 Cal.App.3d 30, 40 [271 Cal.Rptr. 393].) The cited cases involved actions brought under the California Environmental Quality Act. Such cases are governed by specific standards of review contained in Public Resources Code sections 21168 and 21168.5, providing for a stricter inquiry than is indicated here. (See, e.g., *Fullerton Joint. Union High School Dist* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 794, fn. 14 [187 Cal.Rptr. 398, 654 P.2d 168].) While we do not reject the general proposition that a court may consider new evidence in a mandamus proceeding where factual questions are raised by the pleadings, we do not believe that rule applies here where we are presented only with the legal question whether an agency acting in its quasi-legislative capacity has exceeded its authority. (*Brock* v. *Superior Court, supra,* 109 Cal.App.2d at p. 605; and see, generally, *Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 795-800 [136 P.2d 304].) "[T]he determination whether the decision was arbitrary, capricious or entirely lacking in evidentiary support must be based on the 'evidence' considered by the administrative agency." (*Lewin* v. *St. Joseph Hospital of Orange, supra,* 82 Cal.App.3d at p. 387, fn. 13; *Faulkner* v. *Cal. Toll Bridge Authority, supra,* 40 Cal.2d 317, 329-331.) Consideration of reports prepared long after the agency has acted would therefore be improper. (*Lewin, supra,* at p. 388;

*Brock* v. *Superior Court, supra,* 109 Cal.App.2d at pp. 603-605.) We will confine ourselves to the administrative record before the Board and find harmless any error by the trial court in considering evidence received for the first time at trial.

## II.

### THE RESIDENTIAL DEVELOPMENT FEE—RESOLUTION NO. 87.12

■ There is no question that the Board was authorized by the Legislature under Government Code sections 53080 and 65995 to impose a district-wide school facilities fee. Even in the absence of specific enabling legislation, development fees have been found to be a valid exercise of police power. (See, e.g., *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606]; *Builders Assn., supra,* 13 Cal.3d 225.) " 'The position of the public entity is that this arrangement is only fair. The developer has created a new, and cumulatively overwhelming, burden on local government facilities, and therefore he [or she] should offset the additional responsibilities required of the public agency by the dedication of land, construction of improvements, or payment of fees, all needed to provide improvements and services required by the new development. . . .' " (*Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 325 [170 Cal.Rptr. 685] (*Trent*), quoting Longtin, California Land Use Regulations (1977) p. 617.)

Thus development fees operate as a special assessment to pay for facilities to be installed in the future based on an assumed level of need generated by the assessed parcels. (*J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745, 755 [203 Cal.Rptr. 580] (*Jones*).) "It is undisputed that a subdivider must pay for the streets, sewers, lights, and parks which are reasonable conditions for dedication so as to conform to the welfare of the lot owners and the general public. Surely, it cannot be argued that any of these requirements are more important to the welfare of the lot owners and the general public than the education of children." (*Trent, supra,* 114 Cal.App.3d at p. 328; *Associated Home Builders etc., Inc.* v. *City of Walnut Creek, supra,* 4 Cal.3d at p. 644.)

■ While it is "only fair" that the public at large should not be obliged to pay for the increased burden on public facilities caused by new development, the converse is equally reasonable: the developer must not be required to shoulder the entire burden of financing public facilities for all future users. "[T]o impose the burden on one property owner to an extent beyond his [or her] own use shifts the government's burden unfairly to a private

party . . . ." (*Liberty* v. *California Coastal Com.* (1980) 113 Cal.App.3d 491, 504 [170 Cal.Rptr. 247], fn. omitted.) It follows that facilities fees are justified only to the extent that they are limited to the cost of increased services made necessary by virtue of the development. (*Trent, supra,* 114 Cal.App.3d 317; *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1506 [246 Cal.Rptr. 21] (*Russ Bldg.*).) The Board imposing the fee must therefore show that a valid method was used for arriving at the fee in question, "one which established a reasonable relationship between the fee charged and the burden posed by the development." (*Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1219 [265 Cal.Rptr. 347] (*Bixel*); *Jones, supra,* 157 Cal.App.3d 745.)

In our view such a showing with respect to the fees in this case must involve the interrelation of three elements. First, since the fee is to be assessed per square foot of development, there must be a projection of the total amount of new housing expected to be built within the District. Second, in order to measure the extent of the burden imposed on schools by new development, the District must determine approximately how many students will be generated by the new housing. And finally, the District must estimate what it will cost to provide the necessary school facilities for that approximate number of new students.

Since the process required of the District will necessarily involve predictions regarding population trends and future building costs, it is not to be expected that the figures will be exact. Nor will courts concern themselves with the District's methods of marshalling and evaluating scientific data. (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579]; *Stauffer Chemical Co.* v. *Air Resources Board, supra,* 128 Cal.App.3d at p. 795.) Yet the court must be able to assure itself that before imposing the fee the District engaged in a reasoned analysis designed to establish the requisite connection between the amount of the fee imposed and the burden created. We do not believe this can be accomplished without addressing all three factors enumerated above.

■ Resolution No. 87.12 was based primarily upon the "Supporting Rationale" prepared by the District's director of business and administrative services, Robert Nicolai, which in turn summarized data developed by the Morgan Woollett study, the report from the Milpitas City Planning Department and information obtained from developers in the area. After reviewing the record we conclude that the rationale is flawed and does not in fact support the conclusion it reaches, that a fee of $1.50 per square foot of new residential development is "reasonably related to the need for schools caused by the development."

The Nicolai report proceeds upon the following analysis: Enrollment projections indicate that by the year 2000, enrollment in District schools will reach 12,211 students. The total amount needed for new facilities to accommodate this number of students is estimated at $17,482,200. New housing expected to be built within the District over this time period will total 7,135,500 square feet. If the maximum fee of $1.50 per square foot were to be imposed on all new residential construction, the total amount of fees generated would be $10,703,250, some $6,778,950 short of meeting the total estimated needs. Therefore, the report concludes, the $1.50 per square foot fee is fully justified.

Nowhere in the Nicolai report is there an attempt to determine which portion of the total increase in student population is attributable to new development and therefore which portion of the total cost of new facilities should be allocated to the developer.

The analysis in the Nicolai report is similar to that found lacking in *Bixel, supra,* 216 Cal.App.3d 1208. That case involved a fee imposed on new developments to pay for city fire hydrants and water main replacements. The amount of the fee charged was determined by a percentage obtained by dividing the average annual cost to the city of all fire hydrants and water main replacements by the total value of building permits issued during the same time period. The court in *Bixel* found the ordinance there to be constitutionally invalid. "[T]he record did *not* establish that the 'average annual cost' figure exclusively reflected the cost of *new development. . . .* For that reason no reasonable basis for imposing the 'percentage' on new developers was demonstrated by City." (*Id.* at p. 1219.)

In our case Nicolai used a comparable method to determine the development fee per square foot of new development: he divided the total projected cost of new facilities by the total projected square footage of new development. Since that yielded a figure well over the statutory maximum of $1.50 per square foot, he concluded that a fee of $1.50 was justified. Referring back to our suggested calculus, the second element, involving a determination of the approximate number of students expected to be generated by the projected new housing, was missing.

Unlike *Bixel,* however, it appears that in our case the data necessary to supply the missing element was available in the record before the Board, in the study provided by Morgan Wollett Associates. That study, which compiled projected figures for enrollment growth from 1986 to 1991, estimated that growth due to students from new housing during that time period would account for 54.9 percent of the overall enrollment increase. Although Nicolai's "Supporting Rationale" purportedly relied upon the Morgan Woollett

study as the basis for its enrollment projections, it inexplicably failed to incorporate this 54.9 percent figure or otherwise separate the various components of the enrollment growth.

The increase in students due to new housing could also, apparently, have been derived by multiplying the "student yield ratio," a figure representing the average number of children per household, times the projected number of new housing units. The parties differ in their selection of the appropriate student yield ratio and the method of its application in this case. Our task here does not require that we resolve that conflict. All that is necessary is that the District make a reasonable choice after considering the relevant factors. (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 702; *California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d at p. 212.) The supporting rationale, however, did not apply *any* means to estimate the approximate number of students expected to be generated by new housing.

That defect results in a flaw in the final element of the equation as well, for the supporting rationale estimates the costs to accommodate the entire increased enrollment without apportioning those costs to students from new development.

Since the record demonstrates that the Board imposed the maximum $1.50 per square foot without relating that fee to the developer's fair share of costs, imposition of a fee in that amount is insupportable. As we discuss in the next section, the District must refund that portion of the fees which does not reasonably reflect the cost of services provided. (§ 66020(e).)

██ Shapell's remaining claims, although they do not affect the outcome, bear some comment here. Shapell attacks the cost estimate used by the District on the ground that it included costs of improving school facilities rather than simply expanding them. Shapell argues that the District has attempted to take advantage of the statutory mandate by charging the developer for certain planned improvements which would benefit all students districtwide. In particular, Shapell objects to the inclusion in the District's list of proposed new facilities of a six-room science wing at Milpitas High School at an estimated cost of $1,836,000.

Shapell also points out that the District's estimate of costs for new classrooms indicates a student-to-classroom ratio of 28 to 1, which is lower than the existing ratio districtwide. The use of the lower ratio naturally results in a higher number of classrooms and consequently a higher total cost estimate. It also impacts the quality of service since all students districtwide

would presumably benefit from smaller class sizes. Again, Shapell argues that the developer should not be required to pay to improve the quality of education for all.

In this same vein Shapell contends that cost estimates should be limited only to construction of new classrooms and must not include supporting facilities such as bathrooms, expanded staff and office space, new playground and gym facilities, etc. Likewise it is argued that the developer should not be responsible for costs of renovating or refurbishing existing buildings which can continue to be used in their present condition.

The District counters all of these claims. In general it defends the cost estimate on the grounds that it was not intended to be a permanent blueprint for expansion but rather a fair estimate of future needs. Any increase in enrollment, the District argues, will necessitate not only new installations but in some cases upgrading of old ones; the consequent incidental benefit to all students districtwide cannot be avoided and does not invalidate the methodology.

Moreover, the cost estimate involved numerous interlocking decisions and, as the District contends, reflects on the whole a conservative approach to costs. For instance, the District points out that it used the cost of "relocatable" classrooms rather than permanent construction. It did not include costs to expand turf and blacktop playground areas or staff parking. It did not include additional electrical service to accommodate the new facilities (an estimated $4,000 to $5,000 per site). And it did not factor in the increased cost of relocatable classrooms, construction equipment, etc., in the future due to inflation. The District argues that in light of these considerations it would be unfair to single out one or two items in the costs list for deletion. It objects, for example, to the suggestion that the entire cost of the science wing be deleted without allowing it to replace that item with the cost of required regular classrooms. And finally, as to the student-to-classroom ratio, the District responds that it used a 28-to-1 ratio in its cost estimates because that is the suggested standard statewide.

As this discussion illustrates, there are pros and cons as to the myriad decisions regarding what is or is not reasonably necessary to maintain the quality of education for an enlarged student body. In concept we agree with Shapell that while development may be responsible for funding its proportionate share of school facilities to serve the students it generates, it should not be obliged to provide better classrooms or more classrooms per student than are currently available. Nor, arguably, should the developer be accountable for costs of correcting problems of deferred maintenance or modernizing existing structures which are still functional.

On the other hand, the District's points are also well taken. The presence of new development may not only necessitate new facilities but also in some cases refurbishing old ones, in order to maintain a similar level of service. Renovation may also provide enhanced capacity for increased enrollment. (See, e.g., *Bixel*, *supra*, 216 Cal.App.3d at p. 1220.) Moreover, it is not unreasonable that an expanding student body will generate a need not only for new classrooms themselves, but also for new science labs, gyms, libraries, study halls, bathrooms, offices, etc. If those supporting facilities are necessary to maintain a level of service commensurate with that presently existing, we see no reason why development should not also pay a proportionate share of the cost of those new facilities.

■ The point is that the enabling legislation vests the school districts with the discretion to make these decisions in the first instance. The Board must resolve the issues by reference to the standard of reasonableness and the purposes of the enabling legislation. On appeal the District's choices will be presumed to be correct and the courts may not question its wisdom or substitute different choices where the issues are "fairly debatable." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461-462 [202 P.2d 38, 7 A.L.R.2d 990]; *Pitts* v. *Perluss*, *supra*, 58 Cal.2d at pp. 834-835.) If reasonable minds might differ, the District's determinations must be upheld. (*Manjares* v. *Newton*, *supra*, 64 Cal.2d at pp. 370-371; *Russ Bldg.*, *supra*, 199 Cal.App.3d at p. 1503.)

■ We acknowledge that the task of the drafters of these ordinances "is not without substantial difficulty." (*Bixel*, *supra*, 216 Cal.App.3d at p. 1220.) It is obvious that construction and reconstruction of school facilities will provide an incidental benefit to all students within the district, whether they come from homes in the new developments or not. As a practical matter it will not always be possible to fashion a precise accounting allocating the costs, and consequent benefits, of particular building projects to particular portions of the population. All that is required of the District is that it demonstrate that development contributes to the need for the facilities, and that its choices as to what will adequately accommodate the influx of students are reasonably based. (*Jones*, *supra*, 157 Cal.App.3d at p. 757; *Balch Enterprises*, *supra*, 219 Cal.App.3d at p. 795.) With the exception of the flaw in the District's supporting rationale we have discussed above, we conclude that the District acted within the authority vested in it by the Legislature.

■ We turn briefly to a final issue addressed by the parties, and that is whether the development fee constitutes a "special tax." (Gov. Code, § 50076.) If so, it violates California Constitution article XIII A, section 4

(Prop. 13), because it was imposed without the endorsement of a two-thirds majority of the voters in the District.[4]

Much has been written on the subject whether development fees are special taxes. (See, e.g., *California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212 [253 Cal.Rptr. 497] (*CBIA*); *Russ Bldg.*, *supra*, 199 Cal.App.3d 1496; *Jones*, *supra*, 157 Cal.App.3d 745; *Trent*, *supra*, 114 Cal.App.3d 317; *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545 [169 Cal.Rptr. 391] (*Solvang*).) Under one line of reasoning, development fees are not taxes at all since they do not bear the indicia characteristic of taxes: they are not compulsory but rather apply only to those who voluntarily choose to develop, they are not imposed upon all nonexempt properties alike, and they are not levied for the purpose of producing general revenue. (*Russ Bldg.*, *supra*, *Solvang*, *supra*, *Trent*, *supra*.) These cases hold that development fees are in the nature of special assessments rather than taxes. Consequently, the limitations described by Article XIII A, section 4, do not apply. (*Jones*, *supra*; *Solvang*, *supra*; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 777].) Indeed, it stands to reason that voters could be expected to endorse the imposition of "taxes" which only the developers would be obliged to pay. Thus, where the fees at issue are directed only at a partial segment of the population, the voting process will not necessarily validate them as "special taxes." (*CBIA*, *supra*, at p. 237.) On the other hand there are cases holding that a development fee may be an invalid special tax absent a two-thirds vote if it exceeds the reasonable cost of providing the service for which it is charged. (*Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567]; *Bixel*, *supra*, 216 Cal.App.3d 1208; Gov. Code, § 50076.)

We need not add to this body of law in this case in view of our conclusion, in the following section, that the unlawful portion of the fees collected pursuant to Resolution No. 87.12 must be refunded. The remaining fees retained by the District are reasonably related to the cost of providing the increased services to the developments and are therefore not included within the definition of special tax. (Gov. Code, § 50076.)

---

[4]Government Code section 50075 states that "[i]t is the intent of the Legislature to provide all cities, counties, and districts with the authority to impose special taxes, pursuant to the provisions of Article XIII A of the California Constitution."

Under article XIII A, section 4, "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district . . . ."

"Special tax" in this context "shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes." (Gov. Code, § 50076.)

## III.

### REFUND OF FEES PAID PURSUANT TO RESOLUTION NO. 87.12

 By the time of trial in 1989, over two years had passed since the enactment of Resolution No. 87.12 and Shapell had paid to the District, under the protest procedures provided in Government Code section 65913.5,[5] over half a million dollars in fees at the $1.50 per square foot rate. Having concluded that the Board's calculations justifying that amount were flawed, we now turn to the question whether that conclusion necessitates a refund of all of the fees collected, as the trial court ordered.

Section 66020(e) provides that in an action protesting the imposition of development fees, if the plaintiff is successful, "the court shall direct the local agency to refund the unlawful portion of the payment, with interest at the rate of 8 percent per annum . . . ." In its motion for a new trial, the District asked the court to vacate its judgment ordering a total refund in light of the mandate of Government Code section 66020 (then numbered 66008). Under Government Code section 66005, the District pointed out, the unlawful portion of the fee is that which exceeds "the estimated reasonable cost of providing the service" for which the fee is imposed. The District asked that the court conduct further proceedings in order to determine the unlawful amount of the fee for purposes of a partial refund. The motion was denied by operation of law after the trial court failed to rule on it. (Code Civ. Proc. § 660.)

Shortly before oral argument in this court the District asked us to take judicial notice of the legislative history of Government Code section 66020 (Sen. Bill No. 2136, enacted in 1984 as Gov. Code, § 65913.5).[6] Prior to the enactment of this statute, a developer could not challenge the validity of fees imposed on a residential development without refusing to pay them. (*Pfeiffer* v. *City of La Mesa* (1977) 69 Cal.App.3d 74, 78 [137 Cal.Rptr. 804].) Since payment is a condition of obtaining the building permit, a challenge meant that the developer would be forced to abandon the project. The bill was drafted to correct this situation. It provided a procedure whereby a developer could pay the fees under protest, obtain the building permit, and proceed with the project while pursuing an action to challenge the fees. If the action were successful, the fees would be refunded with interest.

The history furnished by the District reveals an earlier version of the bill which would have provided for a total refund of all fees collected. That

---

[5]Section 65913.5 was added to the Government Code in 1985 (Stats. 1984, ch. 653, § 1, p. 2411). It was subsequently renumbered 66008 in 1988 (Stats. 1988, ch. 418, § 4, p. 1787) and again renumbered 66020 in 1990 (Stats. 1990, ch. 1572, § 22). We will be using the current numbering.

[6]Shapell does not contend that the legislative history is an improper subject for judicial notice and we hereby grant the District's request.

version prompted a letter from counsel for the League of California Cities explaining that "[i]n many instances the exaction in and of itself is lawful but the amount of it is found to be excessive." Counsel's letter suggested that the bill be amended to include the language it now contains, i.e., that only " 'the unlawful portion of' the payment" must be refunded. The amendment was added, apparently in response to the concerns expressed in counsel's letter, and we can conclude that indicates a rejection of the prior version providing for a full refund. (*Wiley* v. *Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 192, fn. 8 [269 Cal.Rptr. 240].)

In light of the late submission of the request for judicial notice, we asked for further briefing from the parties on the issue whether section 66020(e) should have been implemented by the trial court in this case and either a partial refund of the "unlawful portion" of the fee ordered or further proceedings held. To our knowledge there has been no published case applying this statute to effect a partial refund.

Shapell first takes the position that section 66020(e) should not change the result reached by the trial court. Relying chiefly upon *Beaumont Investors* v. *Beaumont-Cherry Water Dist., supra,* 165 Cal.App.3d 227 and *Bixel, supra,* 216 Cal.App.3d 1208, Shapell argues that Resolution No. 87.12 is unlawful in its entirety because the District failed to show that the fee was reasonably related to the costs of providing facilities for new development.

In *Beaumont,* a developer challenged a "facilities fee" imposed by a local water district as a condition of connecting new housing to the water system.The fee was designed to reimburse the water district for the future costs of expanding water system facilities to meet the needs of new development. But as the Court of Appeal found, the record of the proceedings contained none of the studies which had apparently supported the Board's enactment of the resolution. It showed only that the Board had declared a need for new facilities and a corresponding need for financing the cost of those improvements. The court therefore found that there was no evidence from which it could conclude that the fee "[did] not exceed the reasonable cost of providing the service . . . for which [it was] charged," and it invalidated the Board's resolution in its entirety. (*Beaumont Investors* v. *Beaumont-Cherry Water Dist., supra,* 165 Cal.App.3d at p. 238; Gov. Code, § 50076.)

*Beaumont* is distinguishable from our case where there is an extensive record containing specific data and showing the framework upon which the District relied in determining its fee. Moreover, even if there had been a record in *Beaumont,* upon which the court might have determined the lawful and unlawful portions of the fee, there was no reason to do so. The statutory

procedure providing for a refund was not in place in 1981 when the developer in *Beaumont* filed his action. No fee had been paid and consequently the question of a refund did not arise. *Beaumont*, therefore, has little bearing on the issue whether a partial refund under section 66020(e) is warranted here.

In *Bixel*, the developer paid the city's "fire hydrant fee" and filed suit challenging the ordinances imposing the fee. The Court of Appeal reversed a summary judgment in favor of the city, finding that city's method of calculating the fee was constitutionally impermissible because city had charged new development with the total "average annual cost" of new facilities citywide, without showing that those costs were limited to costs made necessary by new development. The court concluded that summary judgment should have been awarded to Bixel as a matter of law and the fee paid under protest refunded to it.

Shapell urges that we follow the analysis in *Bixel* to reach the conclusion here that Resolution No. 87.12 must be invalidated in its entirety and all fees refunded. This we decline to do, for several reasons. First, there was no discussion, or even mention, in *Bixel* of the refund procedure described in section 66020(e) (which was numbered at that time Government Code section 66008.) Thus the holding in *Bixel* does not provide any guidance as to the application of that statute. Moreover, it is impossible to tell whether the record in *Bixel* furnished a basis from which to compute the lawful and unlawful components of the fee charged. Perhaps more importantly, however, neither *Beaumont* nor *Bixel* involved the imposition of school fees, which are specifically authorized by sections 58030 and 65995 of the Government Code. Here the enabling legislation includes an express finding that the levying of fees by local school districts, up to $1.50 per square foot, is "a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district." (Stats. 1986, ch. 887, § 7, p. 3080.) Thus a strong argument could be made that in regard to school fees the Legislature has determined as a matter of law that the requisite nexus exists linking new development to the need for new school facilities, and that a fee of up to $1.50 per square foot of residential development, depending upon local needs, has the Legislature's stamp of approval.

The evidence in the record here overwhelmingly supports a finding that students from new development will comprise a substantial portion of the projected increase in enrollment in the District and therefore will contribute proportionately to the overall need for new facilities. As a prominent developer of real property in this state, Shapell itself must concede that the imposition of school fees in some amount is, in the words of Justice

Mosk, "an undisputed and indisputable instance of economic regulation." (*Candid Enterprises, supra,* 39 Cal.3d at p. 890.)

All of these considerations lead us to the conclusion that the partial refund mandated by section 66020(e) is the appropriate remedy here. Indeed, this appears to be the precise situation for which section 66020(e) was intended: the exaction is lawful but the amount is excessive.

We turn then to the issue how the excessive amount of the fee is to be determined. The District argues that the principle of separation of powers demands that the matter be returned to it to determine the lawful and unlawful portions of the fee, for the reason that the Legislature vested it with the discretion to make the decisions necessary to such a determination. At oral argument the District pointed out that further studies have been done to support a new resolution imposing school fees, which has superseded Resolution No. 87.12. Those studies, it contends, could also be used as a basis for determining the lawful and unlawful portions of the fee in question here. The District strongly urges that fee setting is a legislative function which does not warrant judicial interference at any stage.

Shapell, on the other hand, argues that it would be unjust to allow the District to determine the amount of the refund. Any process which determines the excessive portion of the fee necessarily also determines the reasonable portion. That is precisely the task which was delegated to the District in the first instance and which it failed to perform. Assuming a partial refund is in order, Shapell would have this court or the trial court determine what is the unlawful portion of the fee. In the alternative, Shapell suggests that the trial court, or the District, hold further proceedings and hear evidence as to the actual number of students which has been generated by new development from 1987, when Resolution No. 87.12 was passed, to 1990, when the new resolution apparently superseded Resolution No. 87.12. Shapell argues that since the District failed to demonstrate the requisite link to new development in its projected figures, the fee should be determined by reference to the real numbers.

In our view, the amount of a reasonable fee must be determined, if possible, on the basis of the evidence before the Board at the time it enacted Resolution No. 87.12. In this case the record provides a relatively simple arithmetical means of resolving the issue, which does not require that we interfere with the legislative process. The identified flaw in the District's methodology was that it apportioned the total projected cost of all new facilities, namely $17,482,200, over the total square footage of expected new development, 7,135,500 square feet. In other words, it charged the developer

with the cost of providing facilities for the entire new student population. As we discussed in part II herein, the District's supporting rationale inexplicably failed to incorporate the 54.9 percent figure provided by the Morgan Woollett study to determine how many of these new students would be generated by new development. If, as the study concludes, 54.9 percent of all new students will come from new development, it follows that new development should be responsible for 54.9 percent of new facilities for the expanded student population, or $9,597,728. When this amount is apportioned over the total square footage of projected new development, it yields an assessment rate of $1.35 per square foot. The evidence before the Board at the time it passed Resolution No. 87.12 fully supports a fee in that amount. The balance of the funds collected by the District at the higher rate, which constitutes 10 percent of the total, must be refunded to Shapell, including interest at the rate of 8 percent as mandated by section 66020(e).

IV.

THE COMMERCIAL/INDUSTRIAL FEE—RESOLUTION NO. 88.7

█ The Board was presented with no evidentiary basis for the $0.25 per square foot fee imposed on commercial and industrial development by Resolution No. 87.12, other than the representation that the residential fees would not produce sufficient revenue to meet the needs of an increased enrollment. This is inadequate under any standard and that portion of Resolution No. 87.12 imposing fees on commercial and industrial development is invalid. (See, e.g., *Balch Enterprises, supra,* 219 Cal.App.3d at pp. 794-795.) We therefore affirm the trial court's judgment insofar as it ordered that all fees collected on commercial and industrial development pursuant to Resolution No. 87.12 must be refunded to Shapell.

Apparently recognizing the inadequacy of Resolution No. 87.12 in this respect, the District commissioned a further study, which was submitted to the Board in October of 1987. On the basis of that study, prepared by school planning services (SPS), the Board passed Resolution No. 88.7, reimposing the maximum fee of $0.25 per square foot on commercial and industrial development districtwide.

At the time, Government Code section 65995, subdivision (b)(2) required that an agency make two findings before imposing such a fee. It must find both that the fee "shall bear a reasonable relationship and be limited to the needs of the community for elementary or high school facilities" and that it

"shall be reasonably related and limited to the need for schools caused by the development." The first of these findings apparently refers to the availability of school facilities in general, presumably including those facilities to be provided by funds collected from residential development. Thus fees on commercial/industrial development may not be warranted at all unless amounts collected from residential development do not meet the community's needs. (*Balch Enterprises, supra,* 219 Cal.App.3d at p. 794.) The second required finding simply reiterates the reasonable relation test we have addressed in part II herein. It ensures that the agency has engaged in an analytic process to determine a rational connection between the fee imposed and the need generated by the payor of the fee.

The Board made both required findings in Resolution No. 88.7 and the District argues that these are adequately supported by the data and analysis contained in the report submitted to it by SPS. We agree.

The imposition of school-impact fees on commercial and industrial development is based upon the premise that this type of development will tend to attract new employees with families and therefore will generate new students. In order to arrive at an estimated number of new students attributable to this type of development, SPS conducted surveys districtwide and compiled statistics representing the average employee per square foot for each of seven subcategories of commercial and industrial property. These figures ranged from 1 employee per 631 square feet of retail space to 1 employee per 63 square feet of heavy industrial space. The study then estimated an average number of school-age children per employee household in each of the subcategories of commercial and industrial development. These ranged from .43 students per employee in research and development businesses to .89 students per employee in the subcategory of warehouse space.

From these figures SPS was able to calculate the number of students expected to be generated per square foot of each category of industrial and commercial development. The study then proceeded to estimate an approximate cost per student for new facilities by dividing the total cost of new facilities by the number of new students. And finally, the study adjusted the cost per student by subtracting the amount expected to be collected on residential development. In all, these figures produced a projected cost per square foot of commercial and industrial development in amounts ranging from $1.35 per square foot, for retail uses, to $15.20 per square foot for heavy industrial uses. Because the amounts in each category were well over the maximum allowable fee of $0.25 per square foot, and because residential fees expected to be generated by Resolution No. 87.12 had been shown to be

inadequate to meet the need for new facilities,[7] the study concluded that imposition of the $0.25 per square foot fee on commercial and industrial development was fully justified.

Shapell has numerous complaints regarding the methodology of the SPS study. Many of these were aired in the public meeting October 13, 1987, were responded to in writing by SPS in a supplemental report submitted to the Board the following week, and were again discussed at the public meeting at which Resolution No. 88.7 was passed, on October 27, 1987.

As the court noted in *Balch Enterprises*, the task of determining the likely effect of commercial and industrial development on school enrollment is highly problematical, since it involves the interplay of many changing variables. Consequently, "we would be demanding the impossible by insisting on rigorously supported findings." (*Balch Enterprises, supra,* 219 Cal.App.3d at p. 794.) All that our review requires is that we are able to determine that the Board acted after finding a reasonable relationship between the fee and the need to which the development contributes. (*Id.* at p. 795.)

On the whole we are satisfied that the Board acted with a sufficient basis for imposition of the fees in Resolution No. 88.7. Unlike the Nicolai study, the SPS study focussed upon the particular contribution from commercial and industrial development to the overall increase in student population. It then allocated a portion of the total cost of all new facilities to the relevant segment of the student population. As we have observed throughout our discussion herein, courts reviewing legislative enactments will not concern themselves with an agency's choices of methods for compiling and evaluating data, so long as it appears the agency has reasonably related the fee to the identified need. (*Stauffer Chemical Co.* v. *Air Resources Board, supra,* 128 Cal.App.3d at p. 795.)

 Our conclusion that the fee imposed under Resolution No. 88.7 bears a reasonable relationship to the need for school facilities created by expansion in the commercial/industrial sector also disposes of Shapell's claims that those fees were invalid as special taxes and violated the due process and equal protection clauses of the United States and California Constitutions. As we have discussed, *ante,* development fees are not invalid as special taxes if they do not exceed the cost of the facilities for which they are imposed. (Gov. Code, § 50076.) The District has demonstrated that

---

[7] We note that this aspect of the SPS study is unaffected by our conclusion in part III, that a portion of the residential fees collected pursuant to Resolution No. 87.12 must be refunded.

probable school costs generated by new commercial and industrial development far exceed the amount of the fee imposed. Similarly, if the fees are reasonably related to the need contributed to by the new development, there is no constitutional violation. (*Candid Enterprises, supra,* 39 Cal.3d at p. 890; *Associated Home Builders etc., Inc.* v. *City of Walnut Creek, supra,* 4 Cal.3d 633; *Jones, supra,* 157 Cal.App.3d at p. 757; *Russ Bldg., supra,* 199 Cal.App.3d 1496.)

## DISPOSITION

With respect to Resolution No. 87.12, we affirm that portion of the judgment invalidating the imposition of fees on commercial and industrial development. All fees collected on commercial and industrial property pursuant to Resolution No. 87.12 must be refunded to Shapell, plus 8 percent interest. As to that part of Resolution No. 87.12 which imposed fees on residential property, we reverse the judgment and direct that the trial court order the District to refund to Shapell the unlawful portion of those fees, namely $.15 per square foot, plus 8 percent interest.

With respect to Resolution No. 88.7, we find that resolution to be valid. We therefore reverse that portion of the judgment invalidating Resolution No. 88.7 and direct that the trial court enter judgment in favor of the District.

Each party to bear its own costs on appeal.

Agliano, P. J., and Capaccioli, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 19, 1992. Mosk, J., and Panelli, J., were of the opinion that the petition should be granted.