Filed 3/16/22  CP V Walnut v. Fremont Unified School Dist. CA1/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CP V WALNUT, LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>FREMONT UNIFIED SCHOOL DISTRICT et al.,<br><br>    Defendants and Appellants. | A157722<br><br>(Alameda County Super.<br>Super. Ct. No. RG18901866) |

California has adopted a number of ways to finance the construction and maintenance of public schools.  Two of those ways, authorized by the Government Code,[1] are what is known as Level 2 and Level 3 fees.  These can be imposed by a school district, requiring developers of a new housing project to pay some of the cost of school facilities to handle the number of new students anticipated from the project.

The developer here is CP V Walnut LLC (Walnut), which describes itself as "the owner and developer of the Walnut Residences Project in the City of Fremont," which is planned to have "632 rental apartments." During the course of administrative proceedings before the Fremont Unified School

_____

[1]  Statutory references are to this code unless otherwise indicated.

1

District (District), Walnut was assessed both Level 2 and Level 3 fees. It paid under protest, and then sued to recover the amounts it alleged were "unlawful and excessive." Some of the Level 2 fees were refunded prior to the trial court determining that the Level 2 assessment was "flawed" in part by the manner in which it was calculated, and the Level 3 assessment was statutorily invalid. Walnut and the District then advised the court that they had resolved the "flawed" aspect of the Level 2 assessment, withdrawing it from the litigation. Pursuant to that stipulation, and the accompanying form of judgment and proposed writ of mandate submitted by the parties, the District was directed by the writ to repay Walnut more than $7.3 million for the Level 3 fees improperly assessed and collected, together with approximately $80,000 interest for the refunded Level 2 amounts.

Both sides have appealed. Walnut contends it should have a greater amount of the Level 2 fees refunded. The District contends that, with the exception of the amount of the Level 2 refunds, all fees, Level 2 and Level 3, were properly assessed, and that Walnut is not entitled to recover either additional fees or interest.

We conclude that all of Walnut's arguments against the Level 2 fees are without merit. As for the District's appeal, we reject its efforts to overturn the interest award for the two refunds. However, we agree with its contention that the trial court erred in ruling that the Level 3 fees were void by reason of Proposition 51. That measure, adopted by the voters after Walnut paid the Level 3 fees, provided expanded funding for school construction, but considerable time would pass before the new funds would actually be in the hands of local authorities. Until that occurred, there is nothing in Proposition 51 giving the slightest support to Walnut's argument that passage of that measure effected an across-the-board invalidation of

2

Level 3 fees which had already been assessed and paid.  We will thus reverse and order entry of a new judgment.

## BACKGROUND

The briefs filed by the parties demonstrate that they are thoroughly familiar with the genesis of this controversy (even if not all of that knowledge made it into the briefs).  In the interests of brevity, we mention only the salient highlights.  However, coherence requires an initial examination of the purpose of the fees, and how they are calculated.

### The Problem's History

In 1993, our Supreme Court summarized the complicated evolution of public school finance:

" 'In California the financing of public school facilities has traditionally been the responsibility of local government.  "Before the *Serrano v. Priest* [5 Cal.3d 584] decision in 1971, school districts supported their activities mainly by levying ad valorem taxes on real property within their districts." [Citation.]  Specifically, . . . school districts . . . financed the construction and maintenance of school facilities mainly through the issuance of local bonds repaid from real property taxes.'  [Citation.]

" 'In the early 1970's, in the wake of increased resistance throughout California to rising property taxes, local governments found themselves faced with the task of devising new methods to finance construction of school facilities.  A wave of residential development, causing serious overcrowding in local schools, contributed to the problem.  [Citations.]

" 'In an effort to keep pace with the continuing influx of new students, local governments began the practice of imposing fees on developers to cover the costs of new school facilities made necessary by the new housing.  Such "school-impact fees" were generally considered to be a valid exercise of the

3

police power under the California Constitution (Cal. Const., art. XI, § 7), so long as the local entity could demonstrate a reasonable relationship between the fee imposed and the need for increased facilities created by the development.  [Citations.]'  [Citation.]

"In 1977 the Legislature took its first major step towards a statewide solution to the problem, by granting local governments specific *legislative* authorization—i.e., in addition to their constitutional police power—to impose school-impact fees:  'In 1977, with the passage of Senate Bill No. 201 (The School Facilities Act, effective Jan. 1, 1978), the Legislature specifically authorized cities and counties to enact ordinances requiring residential developers to pay fees to finance temporary school facilities necessitated by new development.  In the preamble to the act, the Legislature set forth its findings that "residential developments may require the expansion of existing public schools or the construction of new school facilities" and that "funds for the construction of new classroom facilities are not available when new development occurs, resulting in the overcrowding of existing schools."  Therefore, "new and improved methods of financing for interim school facilities necessitated by new development are needed in California."  (Gov. Code, § 65970.)'  [Citation.]

"The School Facilities Act, however, was not a complete solution. . . . It did not authorize school districts to impose school-impact fees themselves. The statute merely authorized each school district, when appropriate, to make 'findings' that its schools were overcrowded and there was no feasible method of reducing that condition, and to transmit those findings to the local city council or county board of supervisors; if the latter concurred in the findings, that concurrence furnished a legal basis for the local government to impose the school-impact fees by ordinance.  (§§ 65971–65972.)  The fees

4

could be used only to provide 'interim,' i.e., temporary, classroom facilities. (Now § 65974, subd. (a)(3).) The amount of the fees, as before, was required to be 'reasonably related and limited to the need for schools caused by the development.' (*Id*. subd. (a)(4).) And, . . . in enacting the School Facilities Act the Legislature did not occupy the field of school construction financing and did not preempt local ordinances imposing school-impact fees under the police power. [Citation.]

"Nine years later the Legislature reentered the field of school financing, and this time fully and expressly occupied it. (Stats. 1986, chs. 886, 887, 888, 889.) 'The School Facilities Act, as originally enacted, proved to be a stopgap measure. [Citation.] In 1986 it was substantially revised and expanded with the passage of a comprehensive multibill package, addressing an identified $3.8 billion need for new permanent school facilities to meet the demands of an expanding population. The heart of this legislation, Assembly Bill No. 2926, consolidated the legal authority for assessment of developer fees for school facilities into a single body of law. It authorized the governing boards of the school districts themselves, rather than city councils or county boards of supervisors, to impose school-impact fees districtwide, subject to certain monetary limitations.' [Citation.]

"Dispelling any doubt as to its intent, the Legislature declared in the subject bill that in many parts of California real property development was causing serious overcrowding in schools that traditional public financing was inadequate to relieve, and 'For these reasons, a comprehensive school facilities finance program based upon a partnership of state and local governments and the private sector is required to ensure the availability of school facilities to serve the population growth generated by new development.' [Citation.] Finally, 'The Legislature therefore finds that the

5

levying of appropriate fees by school district governing boards *at the rates authorized by this act* is a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district.' [Citation.]" (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 915–918, fn. omitted.)

## The Statutory Framework

Education Code section 17620 is the starting point. It authorizes the governing board of any school district "to levy a fee . . . against any construction within the boundaries of the district for the purpose of funding the construction or reconstruction of school facilities," but only as to "new commercial and industrial construction" or "new residential construction." (Ed. Code, § 17620, subds. (a)(1)(A)-(a)(1)(B).)

The fee cannot include "regular maintenance or routine repair of school buildings and facilities." (Ed. Code, § 17620, subd. (a)(2)(A).) No building permit or certificate of occupancy can be issued unless the appropriate school district certifies that any assessed construction fee has been paid. (*Id.* subds. (b), (c).)

Pursuant to section 66001, subdivision (a), "[i]n any action . . . imposing a fee," the district must do four things: First, it must identify the purpose of the fee. Second, it must identify the use to which the fee will be put. If the use is financing public facilities, the facilities must be identified; however, the district may identify the facilities by reference to a capital improvement plan, to facilities identified in applicable general or specific plans, or to other public documents "that identify the public facilities for which the fee is charged." Third, the district must determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed. Fourth, the district must determine how there is a reasonable

6

relationship between the need for the public facility and the type of project on which the fee is imposed.

Sections 65995, 65995.5, 65995.6, and 65995.7 set out the procedure for calculating the fee amounts a developer may be charged for residential, commercial, and industrial construction.  Subdivision (b) of section 65995 fixes the maximum amounts (annually adjusted for inflation by the State Allocation Board (SAB)) assessable for the per square footage of "assessable space" for residential construction, and "chargeable covered and enclosed space" for commercial or industrial construction.  These are known as *Level 1* fees.

Section 65995.5 establishes an alternative procedure applicable only to new residential construction.  Unlike Level 1 fees, actual need must be demonstrated.  This is done with a "school facility needs analysis," whose purpose is to determine the extent of the need over the next five years for school facilities that are attributable to new development.  (See § 65995.5, subds. (b)(2), (f).)

Specifically, the needs analysis "shall project the number of unhoused elementary, middle, and high school pupils generated by new residential units. . . .  This projection of unhoused pupils shall be based on the historical student generation rates of new residential units constructed during the previous five years that are of a similar type to those anticipated to be constructed . . . and relevant planning agency information."  (§ 65995.6, subd. (a).)

"The maximum square foot fee . . . authorized by this section that may be collected . . . shall be calculated by a governing board of a school district as follows:  [¶]  . . . The number of unhoused pupils identified in the school facilities needs analysis shall be multiplied by the appropriate amount as

7

provided in . . . Section 17072.10.  This sum shall be added to the site acquisition and development cost . . . ."  (§ 65995.5, subds. (c), (c)(1).)

The projected total square footage of new residential units "shall be based on information available from the city or county within which the residential units are anticipated to be constructed or a market report prepared by an independent third party."  (§ 65995.5, subd. (c)(3).).)

The school district must also apply to the SAB for state school bond funds.  (§ 65995.5, subd. (b)(1).)  If funds from that source are available, the fee assessed is calculated according to the formula set out in section 65995.5, subdivision (c).  These are known as *Level 2* fees.

Finally, "[i]f state funds for new school facility construction are not available, the governing board of a school district that complies with Section 65995.5 may increase the . . . fee . . . calculated pursuant to subdivision (c) of Section 65995.5 by an amount that may not exceed the amount calculated pursuant to subdivision (c) of Section 65995.5."  (§ 65995.7, subd. (a).)  These are known as *Level 3* fees.

These appeals concern the propriety of the Level 2 and Level 3 fees that were assessed against Walnut.

**The Project And The District's Assessment Of Fees**

In November 2015, the City of Fremont approved Walnut's application to build "Walnut Residences," which Walnut described as "relatively unique" in that the 632 planned one and two-bedroom apartments were "not designed to attract many families with children."  Walnut anticipated that the project would only "generate approximately 55 K-12 students."

At that time the District was operating with a state-mandated Long Range Facilities Plan adopted by the District in 2014, when the District had approximately 33,000 students in 39 schools.  Overcrowding was already a

problem, and increases at all levels K-12 were anticipated. To that end, in 2015, the District acquired a site for a new middle school.

About this time, funding from the SAB dried up. This meant that the District was now statutorily authorized to assess Level 3 fees on top of Level 2 fees.

However, as shown above, Level 2 fees can only be assessed if the District prepared a school facility needs analysis. The District did so in 2017, which projected that the District currently had 852 "unhoused" students, and forecast 2,417 "total projected students from future units." This would necessitate construction of four new schools, with a projected cost of more than $77 million. The Level 2 fee was fixed at $13.05 per square foot. The Level 3 fee was initially (May 10, 2017) set at double that—$26.11 per square foot—although, as will be shown, it was subsequently reduced to $23.12.

Walnut believed that the assessed fees—totaling $20,365,068.92—were excessive and unjustified. Walnut paid them under protest, whereupon it commenced this action.

A needs analysis is operative for only one year (§ 65995.6, subd. (f)), which means that Level 3 fees are likewise of limited duration. In May 2018, the District adopted another needs analysis, and re-set the Level 2 fee at $8.83, and the Level 3 fee at $18.17.

<h3 style="text-align:center">Walnut's Complaint</h3>

In April 2018, Walnut filed a complaint in which it alleged three causes of action, two for a writ of mandate—one directed at each level of fees—the other for declaratory relief. Walnut reiterated its belief that "the Project will generate approximately 55 K-12 students, all of whom can be accommodated in two classrooms, at a cost of less than $900,000. Yet the . . . District

imposed [impact] fees in excess of $16,000,000 . . . some $300,000 for each student likely to be generated by the Project."

Concerning the first mandate cause of action, Walnut alleged that a statutory requisite to imposing fees was absent, namely, the lack of funding from state bond funds. Walnut alleged that passage of Proposition 51 by the voters in November 2016 opened a new income stream:

"In August 2017, the State sold the first phase of the bonds authorized by Proposition 51, thereby making over $400 million in proceeds available for new school facility constriction. Based on the sale of these bonds, on September 6, 2017, the SAB resumed apportionment of funds for new construction, approving apportionments of over $400,000,000 to school districts for new school facility constriction.

"At all times herein mentioned, the District has been determined by the SAB to be eligible for and has been actively applying for and receiving apportionments of state funding under the School Facilities Program. Since the passage of Proposition 51, the District has submitted applications for over $60 million in new construction funds from the bonds issued pursuant to that authority, and the SAB has approved apportionment of Proposition 51 bond funds to the District.

"Because one of the express statutory prerequisites to imposition of Level 3 fees—that the SAB 'is no longer approving apportionments for new construction' due to a lack of funds available for new construction—does not exist, the District was not legally authorized to impose Level 3 fees on the . . . Project and is not currently legally authorized to impose such fees."

With respect to the second mandate cause of action, Walnut alleged that "[t]he District's levy and demands for payment of the Level 2 school fees

10

were and are unlawful, arbitrary, capricious and without legal or evidentiary support" for a number of reasons.

First, the fees "are not calculated or justified in the manner specified and required under . . . [the] controlling law." Next, the District "did not comply with the methodologies prescribed by the School Facilities Act, was not supported by substantial evidence, and failed to properly account for or credit other assets and resources available to the District for mitigation of school facility impacts." Walnut identified seven supposed errors in the needs analysis, including "invalidly includ[ing] costs for new school facilities and new school sites . . . that will not be needed to accommodate students from new developments" and "overestimate[ing] the number of students that would be generated by new multi-family development, including the Walnut Residences Project." Thus, Walnut alleged the District had imposed Level 2 fees "at unjustified and excessive rates, without reasonable justification or just compensation," and "unlawfully imposed unconstitutional conditions on the Project."

The parties' disagreement on the validity of the fees formed the basis for the cause of action for declaratory relief.

## The Trial Court's Judgment

Following its examination of the papers, and oral argument, the trial court issued an order explaining its decision. With minor editorial modifications made by us, its pertinent language was as follows:

"Petitioner CP V Walnut, LLC [Walnut] is a real estate company developing a multi-family building in Fremont. As a condition of its ability to develop that building in its territory, Respondent Fremont Unified School District [District] imposed developmental impact fees on [Walnut], purportedly to offset a share of the District's projected costs for constructing

11

or reconstructing new schools to house the increased student population caused by new real estate development. Walnut paid the fees under protest. Walnut now challenges the District's calculations of the permissible rate and petitions this Court for a writ of mandate directing the District to set aside its decision imposing development impact fees and reimburse a portion of the fees it paid. For the reasons stated below, the petition is **GRANTED**.

"Setting impact fees is a quasi-legislative action subject to reversal if shown to be 'arbitrary, capricious, or entirely lacking in evidentiary support.' [Citation.]

"The District abused its discretion when it purported to impose 'Level 3' impact fees under Government Code section 65995.7 when, in fact, state funds for new school facility construction were available. The statute is clear that such fees may only be imposed '[i]f state funds for new school facility construction are not available.' (Gov. Code, § 65995.7[, subd.] (a).) The parties do not dispute that the State Allocation Board received new bond funding and was considering applications for funding at the time the District imposed Level 3 fees on Walnut's project, negating the 'not available' component of the statute.

"The provisions allowing a school district to refund fees (Gov. Code, § 65995.7[, subds.] (b)–(d)) do not compel a different reading, as those provisions have the effect of allowing a refund if the Level 3 fees were properly imposed, which is not the situation here.

"The court will issue a writ of mandate directing the District to set aside its determination that it could impose Level 3 fees as a condition on Walnut's permits and to refund the excess fees Walnut paid.

"The District's calculations of 'Level 2' fees are flawed. The 'generation rate' reported in the 2017 School Facilities Needs Analysis ('SFNA') should be

based on a five-year moving average (Gov. Code, § 65995.6[, subd.](a)) but is, without explanation, roughly 50 percent higher than the years before and after it, even after a downward revision. Furthermore, no data underlying that calculation appears in the Administrative Record, and the court concludes, for that reason, that the District's approval of a generation rate for multi-family housing units in the 2017 SFNA is entirely lacking in evidentiary support. The court will issue a writ of mandate directing the District to set aside its determination that the generation rate for multi-family housing units is 0.2100. Other than the finding by the court that the District's determination of the generation rate lacked evidentiary support in the record, the court does not designate any instruction to the District regarding its exercise of discretion in recalculating the generation rate.

"The District's 'Level 2' fees calculation properly accounted for available local funds. The District did not abuse its discretion in determining that general obligation bonds were designated for upgrading existing facilities, in disregarding state funds for which it had applied, and in disregarding 'Level 3' fees paid by other developers.

"The District's 'Level 2' fees did not improperly consider the cost of acquiring and developing new land for elementary and high schools. The District's 2014 Long Term Plan contemplated reconfiguring its elementary schools to a K-5 grade band from K-6 and expanding existing high school facilities. The District's determination of its current school facilities needs is not bound by its 2014 Long Term Plan. The District's projected need for two elementary schools, one junior high school, and one high school are not 'hypothetical schools' as that term is used in *SummerHill Winchester LLC v. Campbell Union School Dist.* (2018) 30 Cal.App.5th 545. The District's determination that existing school facilities were already 'over capacity' and

therefore inadequate to house the students generated in existing residential units was not arbitrary, capricious, or entirely lacking in evidentiary support. The District's determinations that all students generated by new development would require new facilities, regardless of how its schools are configured, was not an abuse of discretion.

"[T]he District's analysis of available property for development as school sites was supported by substantial evidence and is not an abuse of discretion. The District explained why each site was either unavailable or not suitable for use as a school site. These determinations were not arbitrary, capricious, or entirely lacking in evidentiary support.

"Walnut's petition is **GRANTED**. Walnut must draft and submit a proposed writ consistent with the above order . . . ."

The writ issued in due course, commanding the District to "refund the Level 3 fees . . . in the sum of $7,381,072, . . . together with slightly more than $90,000 interest." Both Walnut and the District appeal from the judgment.

## WALNUT'S APPEAL

### A Preliminary Comment

In its formal letter of protest to the District, Walnut objected to the District "impos[ing] fees in excess of ***$16,000,000***." This was also the amount used by Walnut in its complaint. Although Walnut twice states in its opening brief that it "paid the District fees (totaling over $16,000,000) for the Project. AR 0834-0843," the cited pages in the administrative record document that Walnut tendered two checks totaling $8,304,651.04. This sum was apparently accepted by the District as payment in full, as evidenced by the "CERTIFICATE OF COMPLIANCE For Payment of Developer Fees" dated March 28, 2018. However, the cited pages show that Walnut tendered another pair of checks totaling $12,060,417.88, for which it received a

14

different "CERTIFICATE OF COMPLIANCE For Payment of Developer Fees," also dated March 28, 2018.

As previously mentioned, Walnut had to pay the entirety of the assessed fees in order to get a building permit. (Ed. Code, § 17620, subds. (b), (c).) We were puzzled as to how the cited pages substantiated Walnut's claim that it paid the District $16 million, not $8 million, or $12 million, or $20 million. We asked the parties for supplemental briefing as to "the exact amounts" of the assessments and amounts paid. Citing the same pages in the administrative record, Walnut responded that it had paid $8,304,651.04 and $12,060,417.88, for a total of $20,365,068.92. Still not $16 million, nor a ready explanation as to how or why Walnut consistently used this figure before the trial court.

The precise figure of how much Walnut is actually out of pocket has proved very much a moving target. Even as Walnut went to court, events were still unfolding at the administrative level.

In a footnote of its opening brief, Walnut advises that the District subsequently "acknowledged an error in the calculation of the fee, resulting in a refund of a portion of the fee," but it did not provide a dollar figure for the refund. To judge from the language of the writ, the refund occurred on October 16, 2018, and the amount refunded was $1,909,117.99, hardly an insignificant sum.

In fact, this was the *second* refund. In its brief, the District states: "[P]rior to receiving Walnut's April 18, 2018 Protest letter, the District issued Walnut a voluntary refund in the amount of $3,693,807.81 on April 12, 2018,

15

more than a week before Walnut filed suit against the District on April 23, 2018."[2]  This figure was never mentioned in Walnut's opening brief.

So, here is $5,602,925.80 that was returned by the District.  But from what figure should it be deducted—the $16 million Walnut repeatedly used, or the $20+ million for which Walnut actually wrote checks?

Then there is the matter of the "student generation rate" (which the trial court reduced to "generation rate").  As will be discussed in greater detail in the next section of this opinion, *after* the matter was briefed and submitted for decision, almost two months *after* the court issued the ruling quoted above, the parties came to the court with a written stipulation to the effect that after "the Court issued an order granting petition for writ of mandate finding, in part, that no data underlying the calculation of the District's multi-family student generation rate ('SGR') appeared in the Administrative Record and therefore the SGR calculation was entirely lacking in evidentiary support," "the District has provided [Walnut] with data concerning the basis for calculation of the SGR and the parties have agreed that, in the interests of narrowing the range of disputed issues and eliminating any unnecessary further legal proceedings relating to the SGR, no further action by the District is needed with respect to the SGR issue."  The parties further stipulated "That the Court issue a final judgment and writ of mandate consistent with this Stipulation by omitting any further direction to the District with respect to the SGR issue."

Thus, the only relief Walnut achieved on the Level 2 fees was $90,109.64 for interest on the two refunds voluntarily made by the District.

---

[2]  The language of the writ puts the date of the refund a day later, on April 13th.

16

Finally, the writ of mandate, which was drafted by counsel for Walnut, directed the District to "refund . . . the Level 3 fees . . . in the sum of $7,381,072." We have no idea how this amount was calculated, but we can gather from the writ that it does not include the $5,512,916.81 for the refunds. Both of these sums do not add up to the $16 million Walnut says it paid, much less the $20+ million evidenced by its cancelled checks. The refunds would not account for the difference. Nor does the $90,109.64 interest.

Most of these questions were answered by the supplemental briefing we requested from the parties.

First of all, the District assessed, and Walnut paid, not $16 million, but more than $20 million, specifically the $8,304,651.04 and the $12,060,417.88, for a total of $20,365,068.92.

Nine days later, the District made the first refund, for $3,693,807.81. Walnut's out-of-pocket was thus reduced to $16,671,261.11.

The second refund, the one made after the case had ostensibly been submitted to the court for decision, was for $1,909,117.99. The District tells us, the "total Amount of Fees Assessed/Paid" was $14,762,143.12. This is another figure that did not appear in Walnut's opening brief, or in its supplemental brief when we asked Walnut for "the exact amounts paid . . . and the dates such payments were made." (It was provided by the District in its supplemental brief.) We assume this was the sum, excluding interest, that Walnut was seeking in the trial court.

For a party prosecuting an appeal about money, Walnut appears strangely reluctant to provide a complete narrative with concrete dollars and cents figures.

## Standard of Review

" '[The a]ction imposing school facilities fee is quasi-legislative and reviewed under the narrower standards of ordinary mandate. (Code Civ. Proc., § 1085). We determine only whether the action taken was arbitrary, capricious, or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law. Such limited review is grounded on the doctrine of separation of powers which (1) sanctions the legislative delegation of authority to the agency and (2) acknowledges the presumed expertise of the agency. [Citation.] The inquiry into arbitrariness or capriciousness is like substantial evidence review in that both require a reasonable basis for the decision.' " (*Western California, Ltd. v. Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1492 (*Western California*).)

" 'In a mandamus proceeding, the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law. [Citations.] Trial and appellate courts therefore perform the same function and the trial court's statement of decision has no conclusive effect upon us.' " (*Western California, supra*, 50 Cal.App.4th 1461, 1492.)

Even so, considerable deference must be factored in. "[T]he District's choices will be presumed to be correct and the courts may not question its wisdom or substitute different choices where the issues are 'fairly debatable.' [Citations.] If reasonable minds might differ, the District's determinations must be upheld." (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 239 (*Shapell*).) This court has held that a school district's decision need only be " 'reasonably based' " in order to withstand appeal. (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 332.) Similarly, "[s]ince the process required of the

18

District will necessarily involve predictions regarding population trends and future building costs, it is not to be expected that the figures will be exact. Nor will courts concern themselves with the District's methods of marshalling and evaluating scientific data." (*Shapell, supra*, at p. 235.)

### Walnut's Attack on the Level 2 Fees

Walnut frames its contention with what seems to be admirable clarity:

"The trial court erred in determining that the District validly included the cost of land for new schools in the Level 2 fee. Over 60 percent of the Level 2 fee reflected the cost of acquiring and developing land (at an acquisition cost of $3.5 million per acre) for new elementary and high schools.[3] But three years before it enacted the Level 2 fee, the District adopted a Long Range Facilities Plan, as required under state law, that called for reconfiguring its elementary and junior high schools from a K-6/7-8 to a K-5/6-8 model, moving the sixth grade to middle school. The undisputed facts (as reflected in the Plan and other District planning documents and state funding applications) show that the reconfiguration, coupled with the planned addition of classrooms to existing elementary and high school sites, will make ample capacity available to accommodate all anticipated student growth. The District did not need and does not intend to buy any land for elementary schools or high schools to accommodate students from new development. The District thus cannot lawfully collect school facilities fees to fund the cost of such land.

---

[3] Walnut provided a bit more detail in its trial brief: "The 2017 [needs analysis] determined that the District would incur site acquisition and development costs of $22.3 million for 0.848 of a new elementary school and $11.3 million [for] 0.132 of a new high school, for a total of $33.6 million. This figure alone . . . accounted for $8.12 (or over 60 percent) of the District's Level 2 fee."

19

"Additionally, two years before imposing the Level 2 fee, the District acquired a school site it plans to use for a new middle school that will have ample space to accommodate projected growth from new development. Nevertheless, the District's fee improperly included the cost of acquisition of a new school site for the middle school at more than twice the cost of the site the District had already acquired for that purpose. The District's Level 2 fee should have been based on the actual cost of the land—$1.66 million per acre—and not the hypothetical cost of $3.5 million to acquire new land.

"The District's Level 2 fee also failed to take into account over $150 million in local funds the District had already allocated for the school facilities to be funded by the fees. State law provides that local funds determined to be available for new school construction 'shall be subtracted from the amount [of the Level 2 fee.]' Gov[ernment] Code [section] 65995.5[, subdivision] (c)(2) emphasis added.) The District's failure to comply with this requirement further compromised the legality of its Level 2 fee."

Walnut breaks this contention into two arguments. First, it asserts that "The District's Level 2 Fee Improperly Included the Cost of Land the District Did Not Need and Did Not Intend to Acquire." Second, "The District Failed Properly to Account for Available Local Funds in Calculating the Level 2 fee."

Walnut's first argument has six subparts which occupy 20 pages of its opening brief. However, most of the arguments are premised on an implicit assumption—the number of new students likely to come into the District's classrooms if and when Walnut Residences is built. This is what the trial court called the "generation rate," the one thing the court explicitly condemned as "flawed." Because it is foundational, it will be addressed first.

## The Generation Rate

Walnut does not overtly re-argue the point it repeatedly made before the District and the trial court—that only 55 new students would be attributable to Walnut Residences—but it clearly animates many of the subpart arguments Walnut advances. When it asserts that "the District had no Need for . . . New Elementary or High Schools," and thus the "Level 2 Fee Should Be Adjusted to Delete the Cost of Acquisition of New Land for Elementary and High Schools," Walnut is clearly assuming that new facilities will not be needed because there will not be new students to fill them.

True, Walnut commissioned a "Peer Review" of the District's 2017 needs analysis which uses the "55 K-12 students" but even this figure was only an approximation. In contrast, the District estimated the figure would be 84, which was the figure generated *after* the District acknowledged its original information was erroneous, leading to the first refund to Walnut.

The trial court concluded that the generation rate used in the needs analysis was vulnerable, with this reasoning: it "should be based on a five-year moving average (Gov. Code, § 65995.6[, subd.] (a)) but is, without explanation, roughly 50 percent higher than the years before and after it, even after a downward revision. Furthermore, no data underlying that calculation appears in the Administrative Record, and the court concludes, for that reason, that the District's approval of a generation rate for multi-family housing units in the [needs analysis] is entirely lacking in evidentiary support."

At first glance, this reasoning seems unassailable. The statute cited does indeed provide: "The school facilities needs analysis shall project the number of unhoused elementary, middle, and high school pupils generated by new residential units, in each category of pupils enrolled in the district. This

projection of unhoused pupils shall be based on the historical student generation rates of new residential units constructed during the previous five years that are of a similar type of unit to those anticipated to be constructed either in the school district or the city and county in which the school district is located, and relevant planning agency information, such as multi-phased development projects, that may modify the historical figures." (§ 65995.6, subd. (a).)

However, we are then told by the District that the refund it issued to Walnut (see fn. 2, *ante*) had to do with a downward recalculation of the generation rate, and the following consequences: "Although Walnut had challenged the [original] generation rate calculation on other grounds, the error identified and voluntarily corrected by the District was not directly or indirectly addressed in Walnut's claims *at any point in this litigation*."[4] (Emphasis added.)

The District continues:

"However, the District's calculation of the amended student generation rate was inadvertently omitted from the administrative record and the trial court found the amended student generation rate was unsupported by the evidence.

"After the trial court's ruling, the District provided Walnut with additional data supporting its calculation of the amended student generation rate for multi-family units and *Walnut voluntarily elected to drop its legal challenge to the District's amended student generation rate*. Accordingly, the

---

[4] If this is true, one wonders why the parties did not advise the trial court that the revised generation rate was not a point of dispute, and why the parties thereafter resolved the issue between themselves after they had submitted it to the court for decision.

District's amended calculation of the student generation rate for multi-family units . . . is uncontested."

The cited pages of the clerk's transcript are to a Stipulation Regarding Compliance With Order[5] Concerning Student Generation Rate Data.  One of the "recitals" is that "the Parties have agreed that, in the interest of narrowing the range of disputed issues and eliminating any unnecessary further legal proceedings relating to the SGR [Student Generation Rate], no further action by the District is needed with respect to the SGR issue."[6]

Thus, the generation rate, and the number of students produced by application of that rate, are no longer "disputed issues."

### The District's Need For New Schools

To reiterate:  "The school facilities needs analysis . . . shall be conducted by the governing board of a school district to determine the need for new school facilities for unhoused pupils that are attributable to projected enrollment growth from the development of new residential units over the next five years.  The school facilities needs analysis shall project the number of unhoused elementary, middle, and high school pupils generated by new residential units, in  each category of pupils enrolled in the district.  This projection of unhoused pupils shall be based on the historical student generation rates of new residential units constructed during the previous five years . . . ."  (§ 65995.6, subd. (a).)

The revised needs analysis projected that the District currently had 852 "unhoused students," and forecast 2,417 "total projected students from future units."  This would necessitate construction of four new schools, with a projected cost of more than $77 million.

---

[5]  This is the Order Granting Petition For Writ of Mandate already quoted.

[6]  This stipulation is not mentioned in Walnut's opening brief.

The first and second subparts of Walnut's initial argument—"The Undisputed Facts Show That the District Had No Need for and No Intent to Purchase Land for New Elementary or High Schools," and "The District's Level 2 Fee Improperly Included the Cost of Land the District Did Not Need and Did Not Intend to Acquire"—are that "the undisputed facts" demonstrate that the District "had no need for and no interest to purchase" land for a new elementary and a high school, and that it already owned the land for a new middle school, so no acquisition costs should have been included in the level 2 fees.

The first subpart makes much of the District's on-going conversion of elementary from kindergarten through sixth grade to kindergarten through fifth grade, meaning that the sixth graders who were classified as elementary school pupils would now be assigned to middle schools (aka junior high schools). As Walnut puts it, the District's own Long Range Facilities Plan "calls for the addition of new classrooms, labs and other teaching stations at the District's five existing junior high schools to accommodate the addition of the sixth grade. [¶] . . . The classroom additions (including a minimum of 50 classrooms and 16 science labs) were projected by District staff to add capacity 'for more than 1,700 students by 2018/19.' " The rub was that the needs analysis "nowhere accounted for the increase in capacity that would result from the construction of these new classrooms."

Walnut continues: "As a result of the planned and approved change in grade configuration, . . . the District will have excess capacity of 3,169 seats at the elementary (K-5) level. This is more than sufficient to accommodate the 721 elementary students the [needs analysis] projected to be generated from new development over the next five years."

Walnut advances similar reasoning against the purported need for a new high school.

Subparts (1)–(2) & (4)

Where Walnut invokes "the undisputed facts," the District points to an even lengthier number of items and matters it identifies as "undisputed," "uncontested," or "not challenged on appeal." For the District, it claims that its needs analysis faithfully followed the statutory formula, "correctly calculated the District's existing capacity according to this formula and determined that the District was currently overcapacity by 852 students." Thus, because the District was *already* overcapacity, the needs analysis "reasonably" and "rationally" concluded that all future enrollment growth would be attributable to future residential development over the next five years should be deemed "unhoused."

With so much ground ostensibly without controversy, it requires careful—and repeated—examination of the briefs to discern the crux of the dispute. Ultimately, it comes down to this: the District says students already outnumber places for them, and that situation is only going to get worse. Nonsense, Walnut insists: if the District followed through on its Long Range Facilities Plan, the needed places are either already in place or in the pipeline.

But setting the needs analysis beside the Long Range Facilities Plan is comparing a papaya to a pineapple. The Long Range Facilities Plan expressly states it "addresses the educational program and facility needs *at the existing schools*" (italics added), and makes it clear that "No land acquisition costs have been included." In short, the Long Range Facilities Plan looked backwards, while the needs analysis looked forwards. The District puts it nicely in its brief: the Long Range Facilities Plan "work[s] in

25

tandem with its school facilities needs analysis, with the former focusing on improvements and modernization of the District's existing facilities, and the latter addressing the additional school facilities needed to accommodate enrollment growth from new development." The District made an even more telling point in its trial brief: "[The] 2014 Master Plan was prepared to evaluate needs for modernization of existing facilities with anticipated local bond funds, not to evaluate capacity[7] to house student growth generated by new residential development."

Even treating the Long Range Facilities Plan as having a predictive element, its prediction was very quickly disproven. It anticipated enrollment in 2018–2019 at approximately 34,500, but the needs analysis prepared three years later showed existing enrollment as more that 1200 above that figure.

---

7  The District made another pertinent observation in its trial brief: "School capacity is a malleable concept, and representations of a school's capacity can vary considerably depending on the purpose and manner of any given capacity analysis. For example, just looking at classroom loading ratios (i.e., students per classroom), the District's 2014 Long Range Facilities Plan adopted certain classroom loading ratios which are at odds with the District's collective bargaining agreement. Classroom loading ratios are just one of many considerations that impact capacity. A school's capacity is subject to physical, operational, and programmatic variables, some of which are fixed while others are fluid."

Amicus California School Boards Association's Education Legal Alliance makes a similar point: "Projections made in any given year are all the more challenging for school districts because students don't arrive neatly in packages that equal the size of particular classrooms, grade levels or schools. For a developer, 100 students means 100 students. For a school district, that could mean a bubble of 80 students at elementary grade levels within the attendance area of a particular elementary school that push[es] enrollment at that school over its capacity. Moreover, not only do overall enrollment numbers change from year-to-year, but enrollment at particular grade levels change as well, making it difficult to estimate and anticipate the number of students in a given grade [for a given school] for a given school year."

As the District puts it: "Even assuming . . . that the 2014 LRP can be read as supporting the proposition that the District's existing facilities were sufficient to accommodate all projected enrollment growth, those assumptions were clearly laid to rest by 2017 when actual enrollment growth had significantly outpaced the enrollment projections set forth in the 2014 LRP. . . . Thus, when the District adopted the 2017 [needs analysis], the District needed to house far more students than contemplated by the District's 2014 LRP." To straight-jacket the District with what it thought three years earlier would be either to command that the District be clairvoyant, or to deny the possibility that things may change and turn out differently than anticipated. Walnut would deny the District the right to be wrong.

The determination in the needs analysis that the District already had more students than places, together with the accompanying projection of anticipated additional students, "provided a reasonable basis for the school district to decide that multiple new schools would be needed to accommodate the . . . new students that were expected to be generated by new development." (*SummerHill Winchester LLC v. Campbell Union School Dist.*, *supra*, 30 Cal.App.5th 545, 554.) Thus, we agree with the trial court's conclusion that "The District's determination that existing school facilities were already 'over capacity' and therefore inadequate to house the students generated in existing residential units was not arbitrary, capricious, or entirely lacking in evidentiary support." (See *Western California, supra,* 50 Cal.App.4th 1461, 1492.) Walnut's attempt to use the Long Range Facilities Plan to impeach the needs analysis fails.

Walnut's next subpart is that "the undisputed facts show that the [needs analysis] included the cost of land for a new junior high school site although the District had already acquired the land it intended to use for a

27

new middle school." The relevant property is referred to as "the Fremont Boulevard Site" throughout the record.

The thrust of this argument is contrary to statutory language: "When determining the funds necessary to meet its facility needs, the governing board shall . . . [¶] . . . Identify and consider any surplus property owned by the district that can be used as a school site or that is available for sale to finance school facilities." (§ 65995.6, subd. (b)(1).)

To jump to subpart (4), Walnut asserts that the District "was Legally Required to Take Into Account Its Adopted Facilities Plans in Determining the Appropriate Fee."

The District responds as follows (with minor editorial changes): "Walnut concedes that the District's 2017 [needs analysis] 'nowhere' states the Fremont Boulevard property will be used, specifically, as the site for a new middle school. Nevertheless, Walnut improperly cites to post-decision materials to support its argument that the middle school site acquisition costs used in the 2017 [needs analysis] should have been based on the $1.66 million cost-per-acre of the Fremont Boulevard property acquired years before rather than the $3.5 million-per-acre acquisition cost that came from recent real estate comparisons provided by the District's real estate consultant. Specifically, Walnut relies on the December 2017 Facilities Presentation, and the 2018 Gibbs Report prepared by Walnut's hired consultant, to second guess the wisdom of the District's decision making with respect to middle school site acquisition costs utilized in the 2017 [needs analysis.] [¶] . . . [¶]

"Walnut repeatedly misrepresents that the District has decided a new middle school will be constructed on the Fremont Boulevard property, and cites to the December 2017 Facilities Presentation in support, when in fact

28

the Presentation merely references a July 2016 conceptual site study prepared by a consultant that contemplated various possible uses and configurations of the property, including and recommending the '2-story middle school' option. Similarly, the 2018 Gibbs report relied on by Walnut is replete with factual inaccuracies, such as 'per Board action on September 27, 2017,' the District has decided to use 22 acres of the Fremont Boulevard site 'for [a] Middle School with [a] capacity of up to 2,400.' However, the only action taken by the Board that night was a motion to dedicate the front 22-acres of the [Fremont Boulevard] site for the benefit of the AHS Attendance Area. While this shows the District's intent to use the site for a future school facility as stated in the 2017 [needs analysis], it does not equal a decision to use the Fremont Boulevard site for the needed middle school.

"Even if the extra-record evidence cited by Walnut was accurate or convincing, 'consideration of reports prepared long after the agency has acted would therefore be improper.' (*Shapell*, *supra*, 1 Cal.App.4th at p. 233.) Walnut's challenge is limited to what was before the District's Board when its decision was made to adopt the 2017 [needs analysis] and the site acquisition estimate set forth therein, thus Walnut cannot rely on extra-record evidence to raise a question regarding the wisdom of that decision. "

This reasoning is near-conclusive. Just as important is to recall that the needs formula employed a formula spelled out and mandated by statute. (See § 65995.6, subd. (a) ["existing school building capacity *shall be calculated* pursuant to . . . Section 17071.10 . . . of the Education Code," italics added].) As the District repeats, Walnut does not argue that the needs analysis deviated from that formula, or otherwise failed to comply with it. Walnut obviously did not like the amount produced by application of that formula, but its real complaint is that the contents of the formula are

dictated by statute and that the District followed that command. At bottom, Walnut is arguing that the District should have ignored the formula and followed its outdated Long Range Facilities Plan.

Moreover, Exhibit K to the needs analysis, titled "Surplus Site Determination," had this: "35086 Fremont Boulevard . . . is a 32.86-acre site intended for use as a future school site. The site was purchased through the issuance of COPs [Certificates of Participation] and cannot be used to reduce the impact of students generated from non-mitigated Future Units, as Alternative Fees from Future Units are anticipated as the revenue stream to finance the repayment of these outstanding COPs. (It should be noted that the School District has insufficient funds to construct a school facility on this site at this time.) Therefore, this site is not available to offset the impact of students generated from non-mitigated Future Units."[8]

---

[8] The District further explained in its trial brief: "[This] property was purchased through the issuance of Certificates of Participation ('COPs') because the District's bond measure is restricted to use on existing school sites, and the State new construction program lacked funds to provide matching shares to school districts. This property cannot be used to reduce the impact of students generated from non-mitigated residential development projects because available funds cannot be used to build a school on this site and developer fees are the designated source of funding to repay the outstanding COPs debt and interest  As the 2017 [needs analysis] states, the District had, and still has, insufficient funds to construct a school facility on this site. [¶] [Thus], the District's 2017 [needs analysis] properly identified and considered any and all *available* surplus property that could 'be used as a school site or that is available for sale to finance school facilities' as required by . . . section 65995.6(b)(1)."

At another part of the needs analysis, it was explained that COP's "are a means of financing facilities through a pledge of lease payments. . . . All lease payments associated with lease financings must be paid by the issuing school district through its existing sources of revenue." According to the needs analysis, the 2015 acquisition of the Fremont Boulevard site required the District to issued $54,570,000 in COPs.

30

A final point. As already noted, it must be kept in mind that the District's action is deemed "quasi-legislative" and reversible only if " 'arbitrary, capricious or entirely lacking in evidentiary support.' " (*Western California, supra,* 50 Cal.App.4th 1461, 1492.) If that action is " 'fairly debatable,' " or "reasonably based," it will be upheld by the courts. (*Shapell, supra,* 1 Cal.App.4th 218, 239; *Garrick Development Co. v. Hayward Unified School Dist. supra,* 3 Cal.App.4th 320, 332.) Although Walnut's argument does possess a degree of common-sense plausibility, it will not stand the particular scrutiny employed in this context. The District clearly chose to treat the Fremont Boulevard site as "unavailable" because it was already tied to an existing financial program. In this particular instance, how a school district chooses to classify property as "available" or "unavailable" might not square with strict principles of accounting, but it comes within the scope of what is "fairly debatable." Given the notorious recent volatility of the Bay Area real estate market, an extra measure of deference should be extended to a school district's estimate of what it would cost to acquire a site and build a school on it.[9]

---

[9] Amicus makes the cogent reminder that "even if a school board announces its intent to acquire property, there remains uncertainty regarding whether the school district will actually be able to do so. Future school sites must be reviewed by the California Department of Education and the Division of Toxic Substances Control. . . . Acquisition and construction of the school generally must go through the extensive study and public input process of the California Environmental Quality Act. A host of other statutory and regulatory requirements apply that can impact a school district's ability to acquire property. Community opposition to a particular site can arise. Thus, even after a school board identifies a preferred new school site, a range of contingencies could change that initial choice."

An additional wrinkle is statutory: "Site acquisition costs shall not exceed half of the amount determined by multiplying the land acreage determined to be necessary under the guidelines of the State Department of Education, as

Walnut's subpart argument (3) is that "recent caselaw confirms that a mitigation fee may not lawfully include costs the agency will not incur" only states a truism. Yet it does set up Walnut's claim that "the District here already owns the land on which it intends to build or expand the facilities needed to accommodate new development. And . . . it is undisputed that the District does not intend to acquire new land or build new schools to accommodate new development subject to the Level 2 fee. . . . [T]he District's Level 2 fee thus does not have the legally mandated reasonable relationship to the costs of new public facilities attributable to the development." This in turn merges into Walnut's subpart (6): "[The] Level 2 Fee Should Be Adjusted to Delete the Cost of Acquisition of New Land for Elementary and High Schools and to Reflect the Actual Cost of the Land Already Acquired for the Middle School."

These arguments merely reframe the arguments already discussed, and the same reasoning requires their rejection.

Subpart (5)

The last subpart from Walnut is "The District Had and Failed to Carry the Burden of Producing Evidence to Support Every Element of the Fee." The preceding discussion shows otherwise.

**Availability of Local Funds**

In computing Level 2 fees, a school district must follow the following statutory formula:

---

published in the 'School Site Analysis and Development Handbook,' as that handbook read as of January 1, 1998, by the estimated cost determined pursuant to Section 17072.12 of the Education Code. Site development costs shall not exceed the estimated amount that would be funded by the State Allocation Board to its regulations governing grants for site development costs." (§ 65995.5, subd. (h).)

"The maximum square foot fee . . . shall be calculated by a governing board of a school district as follows:

"(1) The number of unhoused pupils identified in the school facilities needs analysis shall be multiplied by the appropriate amounts provided in subdivision (a) of [Education Code] Section 17072.10.[10]  This sum shall be added to the site acquisition and development costs . . . .

"(2) The full amount of local funds the governing board has dedicated to facilities necessitated by new construction shall be subtracted from the amount determined pursuant to paragraph (1).  Local funds includes fees, charges, dedications, or other requirements imposed on commercial or industrial construction.

"(3) The resulting amount determined pursuant to paragraph (2) shall be divided by the projected total square footage of assessable space of residential units anticipated to be constructed during the next five-year period in the school district or the city and county in which the school district is located.  The estimate of the projected total square footage shall be based on information available from the city or county within which the residential units are anticipated to be constructed or a market report prepared by an independent third party." (§ 65995.5, subd. (c).)

---

[10]  "The board shall determine the maximum total new construction grant eligibility of an applicant by multiplying the number of unhoused pupils calculated pursuant to Article 3 (commencing with Section 17071.75) in each school district with an approved application for new construction, by the per-unhoused-pupil grant as follows:  [¶]  (1)  Five thousand two hundred dollars ($5,200) for elementary school pupils.  [¶]  (2)  Five thousand five hundred dollars ($5,500) for middle school pupils.  [¶]  (3)  Seven thousand two hundred dollars ($7,200) for high school pupils." (Ed. Code, § 17072.10, subd. (a).)

Exhibit L to the District's needs analysis is titled "Local Funding Sources per Government Code Sections 65995.5(c)(2) and 65995.6(b)(3)." In the course of four pages, it examined the following as "potential local sources": (1) Lease Financings; (2) General Obligation Bonds; (3) Redevelopment Pass Throughs; (4) Community Facilities Districts; (5) School Fees; and (6) Existing Surplus Funds.

Under the heading "Identification of Existing Surplus Local Funds," the needs analysis read:

"[T]he School District currently has 852 unhoused students from existing residential units. Based on per-student costs calculated in Exhibit E, these existing unhoused students have a cost impact to the School District of $100,561,590.

"Over the next five (5) years, the School District will also need to construct school facilities to house students to be generated from Future Units. Using per-student costs calculated in Exhibit E, providing adequate school facilities to the 1,160 Projected Unhoused Students identified in Section III.C will have a cost of $133,917,740. Table L-1 shows a summary of the school facilities needs of the School District."[11]

"As stated above, the School District has identified the following local funds: (i) $144,511,394 in available GO [General Obligation] Bond Proceeds, (ii) potential commercial/industrial school fees in the amount of $3,432,632, and (iii) potential surplus site revenues in the amount of $6,597,904. Additionally, based on Table 15 of the Analysis, the School District can expect to receive $53,987,395 from Alternative No. 2 Fees on new residential development."

---

[11] Table L-1 shows "Current Unhoused Student Impact" as $100,561,590, and "Future Unhoused Student Impact" as $133,917,740, for a total of $234,479,330.

The bottom line was that the District had $234,479,330 of "School Facilities Needs," but only $208,529,325 of "Local Funding Sources," meaning "there is currently a $25,950,005 funding shortfall."

Under "General Obligation Bonds," the needs analysis stated: "On June 3, 2014, the voters of the School District approved Measure E, which authorized the issuance of $650,000,000 in GO bonds. Of the $650,000,000 to be issued, $144,511,394 has been identified for the construction of new classrooms at existing school facilities. Therefore, it has determined that $144,511,394 is available to offset the impact of students generated from non-mitigated Future Units over the next five (5) years."

In its second, and final contention—"The District Failed Properly to Account for Available Local Funds in Calculating the Level 2 Fee"—Walnut identifies what its claims are four "glaring analytical and legal flaws" in the needs analysis reasoning:

(1) "The alleged $100 million in the cost of housing existing students was based on the same unfounded assumptions about the District's need for land for new elementary and high schools." This is a reframing of part of Walnut's primary argument, which has already been rejected. (See pp. 27-37, *ante.*) As will be seen, it also fails for the reasons stated hereafter.

(2) "Even assuming the $100 Million 'Existing Student Housing Cost' was calculated correctly, this still left $54 million in available local funds that should have been credited against the proposed fees." The $54 million figure appears to be all of the Level 2 fees that the District anticipated assessing for other developments.

The entirety of Walnut's argument is as follows: "Even if the SFNA [the needs analysis] had correctly determined the cost of accommodating existing students at $100 million, there would still have been $54 million

available that should have been credited against the proposed Level 2 fee. As indicated in Table 1 above, this represented 100 percent of the cost of both land and facilities on which the Level 2 fee was based. Had this been properly credited, even with no other adjustments, the Level 2 fee would have been zero."

Walnut's reasoning, insofar as we can discern it, is specious. Walnut is saying that if there is $54 million in Level 2 fees assessed against other developers, that money counts as "available" funds. But it is *not* available because it is intended for those unhoused students generated by a prior development. Walnut wants one payment of Level 2 fees to cover two distinct groups of students.[12] And if Walnut pays no Level 2 fees, it also means it would pay no Level 3 fees. In other words, it is now agreed that Walnut's project will generate new students, but Walnut wants to pay not a dime to educate them.

(3) "The [needs analysis's] inclusion of projected Level 2 fees and projected costs of accommodating students violated the School Facilities Act." Walnut provides four sentences in support: "Government Code § 65995.6 specifies in detail how a school district shall consider and identify local sources available to finance school facilities needed to accommodate students from new development. Section 65995.6[, subdivision] (b)(3) states that the district shall '[i]dentify and consider local sources *other than fees, charges, dedications and other requirements* imposed on residential construction available to finance the construction or reconstruction of school facilities to

---

[12]   The District responds that "these funds are not available in the sense that they did not exist in 2017 and were merely an estimate of potential future funds." However, the practice followed here, mandated by statute, shows otherwise. Level 2 and Level 3 fees must be paid prior to getting a permit to begin construction. (§ 17620, subds. (b), (c).) Cash in hand is not "potential future funds."

accommodate any growth in enrollment attributable to the construction of new residential units.'  The referenced 'fees, charges, dedications and other requirements' include Level 2 fees.  The [needs analysis's] inclusion of the projected Level 2 fees as a local funding source that should be credited against the projected fee violated the statute as well as common sense."

Walnut misreads the plain language of the statute.  It does not *include* Level 2 fees, it clearly *excludes* them:  "When determining the funds necessary to meet its facility needs, the governing board shall . . . [¶]  Identify and consider local sources *other than fees*, charges, dedications, or other requirements *imposed on residential construction* available to finance the construction or reconstruction of school facilities needed to accommodate any growth in enrollment attributable to the construction of new residential units."  (§ 65995.6, subd. (b)(3), italics added].)

The District also points out that if future school impact fees are considered as dedicated local funds that must be subtracted from the total cost to house students from future development, logically both Level 2 and Level 3 fees should be included.  In its words:  "But, by definition, estimated future Level 2 and 3 fees are equal to the total cost to house students from future development.  The result is a mathematical certainty that neither Level 2 nor Level 3 fees could ever be collected under any circumstance.  The Legislature certainly did not intend such a patently absurd construction" of section 65995.6.

(4) "If inclusion of the projected fee in the calculus had been permitted, it should have included 100 percent of the projected fee, not 50 percent."  The supporting reasoning for this, Walnut's final subpart argument, is as follows:

"Even assuming it was appropriate to include projected fee revenues in determining available local funds, the SFNA should have based this on the

37

projected fees recommended in the SFNA, not 50 percent of those fees. The SFNA purported to justify Level 3 fees as well as Level 2 fees, based on total projected school facilities costs of $108 million to accommodate students from new development over the next five years. Thus, in projecting fee revenues, the SFNA should have used that figure (i.e., the figure from Table 19, based on Level 3 fees), not the $54 million figure from Table 15, based on level 2 fees.

"The result would have been to show $262,516,720 in 'Local Funds' available to fund facilities (not the $208,529,325 used in the SFNA). Comparing this to the $234,479,330 in alleged total school facilities needs would have left $28,037,390 that should have been credited against the proposed fee. This alone would have reduced the fee by over 50 percent."

We reject this argument.

Initially, it is not clear that it was made in the trial court. In the relevant portion of Walnut's trial brief, under the heading "The District Failed to Consider and Subtract Available Local Funds," there is no mention of Table 15 or Table 19, and none of the figures quoted above can be found. Thus, the argument now made was not preserved for review. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184–185, fn. 1; 9 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 400, p. 458.)

In addition, the issue "Identification and Consideration of Local Funding Sources per Government Code Sections 65995.5(c)(2) and 65995.6(b)(3)" constituted Exhibit L to the needs analysis. Exhibit L comprises four pages and three tables (L-1, L-2, and L-3), none of which, as shown above, is mentioned or addressed in Walnut's argument. By ignoring this, the most pertinent portion of the needs analysis, we can only conclude Walnut declines to challenge it directly. In consequence, and in application of

38

a fundamental principle of appellate review, we must assume that Exhibit L supports the judgment, and Walnut has failed to demonstrate otherwise. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  Put otherwise, Walnut has not established that the challenged action by the District was " 'arbitrary, capricious or entirely lacking in evidentiary support.' " (*Western California*, *supra*, 50 Cal.App.4th 1461, 1492.)

## THE DISTRICT'S APPEAL
### Striking The Interest Awards

As previously mentioned, in its judgment the trial court ordered the District to pay a specified amount of interest on the two sums it refunded to Walnut.  The District asks us to strike both of the interest components because interest:  (1) was not mentioned in the trial court's previous order, and (2) is not statutorily authorized.

In the prayer of its petition, Walnut gave the District notice that it (Walnut) was seeking "interest at the rate of 8 percent pursuant to Government Code [section] 66020[, subdivision] (e)."  The cited statute provides in pertinent part:  "If the court finds in favor of the plaintiff in any action or proceeding. . . , the court shall direct the local agency to refund the unlawful portion of the payment, with interest at the rate of 8 percent per annum . . . ."  Walnut repeated the request for interest in its trial brief.  In its trial brief, the District did not mention section 66020, and did not address whether Walnut had any legitimate claim to interest.

Also as previously mentioned, after the trial court filed its written decision granting in part Walnut's petition for a writ of mandate, the parties submitted a written stipulation that the court could "issue a final judgment

39

and writ of mandate consistent with this stipulation." Neither the decision
nor the stipulation mentioned interest.

In its decision, the court directed Walnut to "draft and submit a
proposed writ consistent with the [decision]." Apparently contemporaneously
with the stipulation, Walnut submitted a proposed judgment and proposed
writ of mandate.[13] The proposed judgment did not mention interest, but
simply directed that a writ of mandate "shall issue." It was in the proposed
writ of mandate that the issue of interest first appeared.

The judgment was filed on July 2, 2019, and notice of entry was mailed
eight days later. Attached to the judgment as Exhibit A was the writ
prepared by Walnut's counsel. Both the judgment and the writ were
"approved as to form" by the District's counsel.

This chronology establishes that at no point did the District advise the
trial court that it disputed Walnut's claim or entitlement to interest should
it—Walnut—prevail. The District never hinted to the trial court that, as it
now asserts, the form of either the judgment or the writ—both of which the
District had approved—was unauthorized by the court's written decision. In
light of the totality of these circumstances, we must conclude the District
failed to take any step that would have brought the issue to the trial court's
attention for correction. In light of this omission, the matter was not
preserved for review. (*Doers v. Golden Gate Bridge etc. Dist.*, *supra*,

---

[13] The attorney signatures on the stipulation are dated July 1, 2019. The
stipulation was filed the following day. Immediately following in the clerk's
transcript is Walnut's "[Proposed] Judgment Granting Peremptory Writ of
Mandate," which has no file stamp, but has the handwritten notation
"Received 7/2/19," and the signature of the District's counsel recording that
he "approved as to form." The judgment was immediately filed that same
day.

23 Cal.3d 180, 184–185, fn. 1; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 400, p. 458]; cf. *Buck v. Canty* (1912) 162 Cal. 226, 238 ["[A] judgment will not be reversed on appeal because of the failure of the lower court to give relief . . . which it was not asked to give, that is, in effect, for an error which the trial court did not make"].)

## Restoring The Level 3 Fees

As previously described, the predicate for Level 3 fees is that "state funds for new school facility construction are not available." (§ 65995.7, subd. (a).) The concept of "available" is statutorily addressed: "For purposes of this section, state funds are not available if the State Allocation Board is no longer approving apportionments for new construction pursuant to . . . the Education Code due to a lack of funds available for new construction." (*Ibid.*)

From the beginning of this dispute, Walnut maintained that the passage and implementation of Proposition 51 essentially nullified the District's authority to impose Level 3 fees. The SAB may have run out of apportionable funds in 2015, but Proposition 51 put new funds in the pipeline, and by September 2017 the SAB was again making apportionments. Thus, the statutory requirement that "state funds for new school facility construction are not available" was not satisfied when the District imposed— and Walnut paid—the Level 3 fees *in 2018*. This was the basis of Walnut's administrative protest, and, as already shown, the basis of Walnut's attack in its complaint against the Level 3 fees.

The District responded with some of the arguments it advances here: (1) the Level 3 fees were imposed in strict conformity with sections 65995.5 and 65995.7, and (2) the fact that the SAB was infused with new bond funding by reason of the passage of Proposition 51 did not subsequently affect an automatic termination of the Level 3 fees.

41

The trial court agreed with Walnut, viewing the matter as straightforward: "The statute is clear that such fees may only be imposed '[i]f state funds for new school facility construction are not available.' (Gov. Code, § 65995.7(a).) The parties do not dispute that the State Allocation Board received new bond funding and was considering applications for funding at the time [the District] imposed Level 3 fees on [Walnut's] project, negating the 'not available' component of the statute."

On this appeal, the District reiterates the same arguments rejected by the trial court, augmented with two others: (1) Walnut's claim that Proposition 51's restoration of the state bond funding for new school construction effected a de facto repeal or invalidation of existing Level 3 fees was contrary to legislative intent expressed in another provision of the School Facilities Act, and (2) Walnut's claim "lacks practical workability."

We conclude the matter is not as simple and straightforward as the District believes, because the impact of Proposition 51, officially known as the Kindergarten Through Community College Public Education Bond Act of 2016 (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 51 adding Ed. Code, § 101122, p. 118), cannot be ignored. The Legislature has demonstrated in the past when it intends to suspend or temporarily terminate a school district's power to impose Level 3 fees, and there is no evidence of such an intent in Proposition 51. Quite the contrary, there is a provision in Proposition 51 that, by itself, is virtually dispositive in demonstrating that the Legislature intended to have no impact on the power to impose Level 3 fees. Moreover, we believe that accepting Walnut's "automatic termination" position is not only contrary to existing language in the School Facilities Act, it would inject an element of uncertainty that could lead to chaos in the process of funding and constructing new school facilities.

42

Because it looms over the landscape like Gibraltar, Proposition 51 deserves examination.

**Proposition 51**

The Official Title and Summary of Proposition 51 advised voters that the measure:

"Authorizes $9 billion in general obligation bonds:  $3 billion for new construction and $3 billion for modernization of K-12 public school facilities; $1 billion for charter schools and vocational education facilities; and $2 billion for California Community Colleges facilities.

"Bars amendment to existing authority to levy developer fees to fund school facilities, until new construction bond proceeds are spent or December 31, 2020, whichever is earlier."  (Ballot Pamp., *supra*, title and summary prepared by State Attorney General, p. 18.)

The Analysis of the measure prepared by the Legislative Analyst told the voters of the need and the ways and means of addressing it:

"The state typically issues general obligation bonds to pay for facility projects.  A majority of voters must approve these bonds.  From 1998 through 2006, voters approved four facility bonds that provided a total of $36 billion for K-12 facilities and $4 billion community college facilities.  Voters have not approved new state facility bonds since 2006.  Today, the state has virtually no remaining funding from previously issued school and community college facility bonds.  (For more information on the state's use of bonds, see the 'Overview of State Bond Debt' later in this voter guide.)" (Ballot Pamp., Gen. Elec., *supra*, analysis of Prop. 51, p. 19.)

Without question, the purpose of Proposition 51 was to inject a substantial amount of new public money into school construction.  As relevant here, the amount was $3 billion for "New Construction" of "K-12

43

Public School Facilities." (Ballot Pamp., Gen. Elec., *supra*, analysis of Prop. 51, p. 20; *id.*, text of Prop. 51, adding Ed. Code, § 101122, subd. (a)(1) ["The proceeds from the sale of bonds, issued and sold . . . shall be allocated in accordance with the following schedule:  [¶]  . . . The amount of three billion dollars . . . for new construction of school facilities of applicant school districts"].)

As explained in the Overview of State Bond Debt, even with adoption by the voters, a passage of time would occur before the newly authorized funds would actually be distributed to local school districts, a point made clear to the voters, who were clearly informed that there would be an inevitable time-lag between authorization of bonds, their sale, and the proceeds becoming available for distribution to school district.  (See Ballot Pamp., Gen. Elec., *supra*, analysis of Prop. 51, pp. 114 ["The state sells bonds to investors to receive 'up-front' funding for these projects and then repays the investors, with interest, over a period of time"], 115 ["The school bond proposal on this ballot (Proposition 51) would allow the state to borrow an additional $9 billion by selling general obligation bonds to investors.  The amount needed to pay the principal and interest on these bonds, . . . would depend on the specific details of the bond sales [and] . . . the bonds would be issued over a five-year period"]; *id.*, text of Prop. 51, adding Ed. Code, § 101120 ["The proceeds of bonds issued and sold . . .shall be deposited in the 2016 State School Facilities Fund established in the State Treasury under Section 17070.41 and shall be allocated by the State Allocation Board"], 119, text of Prop. 51, adding Ed. Code, § 101130 ["the Treasurer shall sell the bonds . . . at any different times necessary to service expenditures required by the apportionments"], *id.*, text of Prop. 51, adding Ed. Code, § 101132 ["The bonds authorized by this chapter shall be prepared, executed, issued,

44

[and] sold . . . as provided in the State General Obligation Bond Law"].)

Moreover, it was not guaranteed that the entire $3 billion would be released at the same time.  (See Ballot Pamp., Gen. Elec., *supra*, text of Prop. 51, adding Ed. Code, § 101133 ["Upon request of the State Allocation Board, the State School Building Finance Committee shall determine whether or not it is necessary or desirable to issue bonds . . . in order to fund the related apportionments, and, if so, the amount of bonds to be issued and sold.  Successive issues of bonds may be authorized and sold to fund those apportionments progressively, and it is not necessary that all of the bonds authorized to be issued be sold at any one time"].)

So, until the funds reached the districts, there would be a period when the districts would be dependent on the existing financial arrangements, specifically, the power to assess and collect Level 2 and Level 3 fees.

## Legislative & Voter Intent

Both in the trial court and on this appeal, the District has come close to presenting  the matter simply and solely as a matter of statutory construction.  Reduced to its essence, the District contends that it complied with sections 65995.5 and 65995.7 and that should pretty much be the end to the matter, subsequent events being irrelevant.

We have described the approach to statutory interpretation many times.  The fundamental goal is to determine the intent of the legislation.  To do this, we first examine the statutory language.  If its meaning is plain, we apply the words as written.  If the language will support conflicting interpretations, we may consult extrinsic aids.  Finally, we consider reason, practicality, and common sense. (*MacIsaac v. Waste Management Collection & Recycling, Inc.*  (2005) 134 Cal.App.4th 1076, 1082–1084.)  The same principles govern voter initiatives which, in the case of Proposition 51,

45

involve statutes adopted by the electorate instead of the Legislature. (*People v. Buycks* (2018) 5 Cal.5th 857, 879–880.)

These rules, however, are not a precise fit to the situation here. The District naturally looks to, and relies upon, only sections 65995.5 and 65995.7, but our gaze must be broader, taking in the entire statutory scheme governing school finance, which, as will be seen, includes the statutes enacted by Proposition 51 because they deal with the same subject. (*Mendoza v. Nordstrom, Inc.* (2017) 2 Cal.5th 1074, 1084 [" 'We do not construe statutory language in isolation, but rather as a thread in the fabric of the entire statutory scheme of which it is a part' "]; *Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [" ' "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness' . . . " ' "].) Additionally, passage of that initiative undergirded the argument advanced by Walnut and accepted by the trial court. Accordingly we examine both the School Facilities Act and Proposition 51.

The District initially assaults "the trial court's interpretative error" with the following argument: "Once Level 3 fees are triggered, Government Code section 65995.7 does not contemplate any sort of 'automatic reversal' of a school district's authority to impose Level 3 fees, which cannot be disputed given the subsequent 'sunset' provision since added by AB 48." The assault is quickly defeated because its foundation no longer exists.

The District's supportive reasoning runs as follows: "Subsequent to the trial court's decision in this case, . . . the Legislature enacted AB 48, placing the 2020 Bond Act on the March 2020 statewide ballot. The Legislature also added a sunset provision to a school district's ability to impose Level 3 fees, which, if the 2020 Bond Act passes in March [2020], will suspend until

January 1, 2028, a school district's ability to impose Level 3 fees . . . . [¶] . . . AB 48 is suggestive of the Legislature's understanding of current law."

But the 2020 Bond Act—which was more commonly identified as the latest attempt to modify Proposition 13's restrictions on ad valorem real property taxes—was *rejected* by the voters. Thus, there is nothing to be learned from its provisions that never became effective, providing nothing that can be "suggestive of the Legislature's understanding of *current* law."[14] (Italics added.)

However, the District does better, and achieves the same result, by pointing—albeit elliptically— to measures that *were* adopted in the past. Twice, in 2002 and in 2012, the Legislature amended section 65995.7 to put school district's power to impose Level 3 fees into temporary abeyance. The Legislature took pains to specify the precise time period of that abeyance, the reasons for it, and the contingencies for ending it.[15] This stands in

[14] " 'California courts have frequently noted . . . the very limited guidance that can generally be drawn from the fact that the Legislature has not enacted a particular proposed amendment to an existing statutory scheme.' " (*Grupe Development Co. v. Superior Court*, *supra*, 4 Cal.4th 911, 922–923.) Any guidance is further obscured because the Legislature was merely the conduit of a proposed measure that was then submitted to the voters. Whatever the Legislature may have intended, connecting that intent to what motivated the voters to reject the measure seems even more hazardous. If divining the mindset of one group is difficult, it is even harder with two. (Cf. *People v. Skinner* (1985) 39 Cal.3d 765, 785 (conc. opn. of Mosk, J.) ["In an initiative measure, . . . no legislative intent is available; the voter has only the choice of an enigmatic all or nothing"].)

[15] In 2002, the Legislature amended subdivision (a)—the basic authority to impose Level 3 fees—with the following: "Paragraph (1) shall become inoperative commencing on the effective date of the measure that amended this section to add this paragraph, and shall remain inoperative through the earlier of either of the following: [¶] (A) November 5, 2002, if the voters reject the Kindergarten University Public Education Facilities Bond Act of 2002, after which date paragraph (1) shall again become operative.

conspicuous contrast to what happened here, where the Legislature took no comparable action.  The ineluctable conclusion is that, whatever the outcome on Proposition 51, there would be no interruption of districts' power to impose Level 3 fees.

This conclusion is reinforced and underscored by another provision of Proposition 51.  The actual substantive sections of the measure added the Kindergarten Through Community College Public Education Facilities Bond Act as sections 101110 through 101149.5 of the Education Code.  One of the most significant additions was section 101122, whose primary purpose was to allocate the funds for specified purposes.  However, section 101122 also had the following:  "Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7 of the Government Code, as those provisions read on January 1, 2015, *shall be in effect until the full amount of bonds authorized for new school facility construction . . . have been expended, or [until] December 31, 2020, whichever is sooner*."  (Ed. Code, § 101122, subd. (d), italics added.)  This language is near conclusive proof that the Legislature, and the voters, had no intention of invalidating Level 3 fees already assessed and paid.

---

[¶]  (B)  The date of the 2004 direct primary election after which date paragraph (1) shall again become operative."  (Stats. 2002, ch. 33, § 33.)

In 2012, the Legislature again amended subdivision (a) by adding the following:  "Paragraph (1) shall become inoperative commencing on the effective date of the measure that amended this section to add this paragraph, and shall remain inoperative through December 31, 2014, after which date paragraph (1) shall again become operative, except that it may become operative sooner in either of the following circumstances:  [¶]  (A) A statewide school facilities bond passes before December 31, 2014, in which case paragraph (1) shall become operative upon certification of the election in which the voters approved the bond  [¶]  (B) A statewide school facilities bond has not been placed on the ballot for the November 4, 2014, statewide general election by August 31, 2014, in which case paragraph (1) shall become operative on September 1, 2014."  (Stats. 2012, ch. 38, § 75.)

Walnut's s arguments to the contrary are not persuasive.

According to Walnut, the justification—and the authorization—for Level 3 fees vaporized once the SAB was again disbursing funds, and thus Proposition 51 made all existing Level 3 assessments invalid, with no need for additional action by the Legislature. At its most simple, "Level 3 fees are authorized only if . . . the state is no longer [providing] funding." For Walnut, it inexorably follows that "the authority to impose Level 3 fees automatically terminates without further legislative action upon the resumption of apportionment of state funds for new [school] construction." In this case, following passage of Proposition 51, the SAB resumed approving apportionments on September 6, 2017. As Walnut sees it, the District's Level 3 fees became null and void a moment later.

The flaws in this reasoning are sizable.

First, as shown at the beginning of our discussion, the statutory predicate for imposing Level 3 fees is that "state funds for new school facility construction are not available," meaning "the State Allocation Board is no longer approving apportionments for new construction." (§ 65995.7, subd. (a).) It is undisputed that the SAB had not made apportionments since September 2015. Proposition 51 was enacted in November 2016, and the SAB resumed approving apportionments on September 6, 2017. The District's power to impose Level 3 fees arose by operation of law when it approved the needs analysis on April 10, 2017, (§ 65995.6, subd. (f)), that is, *before* the SAB resumed approving apportionments five months later. Thus, "state funds for new school facility construction [were] not available" (§ 65995.7, subd. (a)), meaning that the District had the authority to impose Level 3 fees, and the trial court was therefore in error when it concluded that the District "abused its discretion when it *purported* to impose Level 3

49

fees . . . *when*, in fact, *state funds* for new school facility construction *were available*." (Italics added.)  There is simply no question state funds were *not* available at the time when the District imposed the Level 3 fees.[16]

Second, the purpose of Proposition 51 was to increase the amount of state funds available for distribution to local school district, not to supersede or supplant the existing statutory process for distributing state funds to local school districts.  This is made clear by the provision of Proposition 51 specifying that the authority of schools districts under the School Facilities Act would remain "in effect until the full amount of bonds authorized for new school facility construction . . . have been expended, or [until] December 31, 2020, whichever is sooner."  (Ed. Code, § 101122, subd. (d).)  Further proof can be found in the absence of express language suspending the power to impose Level 3 fees, language the Legislature had twice used in the recent past when—or if—school bond issues were to be submitted to the voters.

Third, there is another rule of statutory/initiative construction that is particularly relevant:  courts may also consider the consequences that might flow from a specific interpretation of statutory language, a rule that is particularly true if the consequences will be absurd.  (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190; *Horwich v. Superior Court* (1999) 21 Cal.4th 272,

---

[16]  We are also puzzled by the trial court's conclusion that the SAB "was considering applications for funding at the time the District imposed Level 3 fees on Walnut's project, negating the 'not available' component of [section 65995.7]."  "Considering" fund applications is not the predicate specified by that statute.  The statutory trigger is whether the SAB "is no longer *approving* apportionments for new construction" (italics added), which, as demonstrated in the text, was indeed the case when the Level 3 fees were imposed on Walnut.

50

276; *People v. Knowles* (1950) 35 Cal.2d 175, 182 (Traynor, J.).) And in this case, it is the practicalities that are decisive.

The problem here arose because the SAB was subsequently infused with $3 billion that could be used for new school facility construction. The new funds did not emerge from the ordinary legislative process, but were the result of an initiative measure, Proposition 51, passed by the voters in November 2016. But it was not until a year later—after the District had assessed, and Walnut had paid the Level 3 fees—that school districts began receiving state funds after the general obligation bonds authorized by Proposition 51 had been sold. Meanwhile, the Walnut Residences Project was on the SAB's list of approved but unfunded developments. Although the record is not completely clear, it appears that the District received some funds, but not enough to cover all of the Level 3 fees, and not until June 2018.

Thus, when the District assessed the Level 3 fees on Walnut, it was doing so in conformity with the relevant law, specifically sections 65995.5 and 65995.7. The new funds from Proposition 51 were on their way, but had not yet arrived or even been apportioned by the SAB. By the time the new funds were ready for apportionment by the SAB, the Level 3 fees assessed by the District had already been paid by Walnut. Nevertheless, according to Walnut, once the funds had been apportioned to the District, the Level 3 fees had to be immediately returned to Walnut.

However, unless the SAB apportioned the full amount of the Level 3 fees, there would likely be a shortfall between the amount needed and the amount available. Building school facilities is a lengthy process, requiring an assured income stream. Materials have to be purchased; labor has to be paid. The idea that a major portion of the overall expense could suddenly disappear would, at a minimum, produce confusion, and might result in utter chaos.

51

That qualifies as an absurd consequence of Walnut's idea that the mere availability of some state funding automatically terminates the validity of Level 3 fees already assessed and collected.

In light of the foregoing, we must reject Walnut's argument that the mere passage of Proposition 51 automatically nullified Level 3 fees already assessed and collected. Walnut's argument is contrary to the plain language of Proposition 51, and results in disruption to existing arrangements that was not intended by the voters.

Finally, the District appears to invite us to decide that school districts can both accept state funds *and* impose Level 3 fees. However, apart from a couple of scattered sentences in the District's brief, the issue is not framed in the correct manner that requires further attention. (See Cal. Rules of Court, rule 8.204(a)(1)(B).) Moreover, the District does not advise how much, if any, state funds it has received, or whether the parties have employed the statutory procedures to prevent a developer from being over-charged in such a situation. (See § 65995.7, subd. (b); Ed. Code, § 17072.20, subd. (b).) Hazarding an analysis in these uncertain circumstances would partake of an advisory opinion, which is not a proper judicial function. (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452; *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.)

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to: (1) recall the writ of mandate; (2) set aside the judgment granting the petition; and (3) enter a new judgment awarding Walnut interest on the refunds, but otherwise denying the petition in conformity with this opinion. The District shall recover its costs of appeal.

_____
Richman, Acting P. J.

We concur:


_____
Kline, J.*


_____
Stewart, J.


*CP V Walnut, LLC v. Fremont Unified School District* (A157722)

*Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.